**PARENTS INVOLVED IN COMMUNITY SCHOOLS, a Washington nonprofit corporation, Plaintiff,**

v.

**SEATTLE SCHOOL DISTRICT NO. 1, a political subdivision of the State of Washington; et al., Defendants.**

**No. C00–1205R.**

United States District Court,
W.D. Washington,
at Seattle.

April 6, 2001.

Harry James Franklyn Korrell, Daniel Benjamin Ritter, Davis Wright Tremaine LLP, Seattle, WA, for plaintiff.

Mark Stephen Green, Seattle School District # 1, Office of General Counsel, Seattle, WA, Carol Sue Janes, Michael Madden, Bennett Bigelow & Leedom PS, Seattle, WA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROTHSTEIN, District Judge.

### I. BACKGROUND

For over thirty years the Seattle School District has made efforts to ameliorate the often pernicious consequences of the racial isolation in its schools that would, but for those efforts, track the racial segregation of the city's housing patterns. A majority of Seattle's white residents live in neighborhoods in the northern, historically more affluent end of the city. A majority of the city's African American, Asian American, Hispanic and Native American residents live in the south. Racial isolation in schools may render a child indifferent to the benefits and responsibilities incumbent on citizens of a pluralistic society. Racial isolation may also prevent a child from being exposed to much of the educational and socio-economic opportunity this nation promises.

Since the 1960's, while courts around the country were ordering intransigent school districts to desegregate, Seattle's school board was voluntarily exploring measures that were designed to provide all of the district's students with access to diverse and equal educational opportunities. At one time the district experimented with mandatory busing procedures that met with widespread dissatisfaction and even outrage. More recently, responding to its constituents' concerns, the school board has sought to develop less coercive policies that would afford parents and students more choice in selecting which high school to attend, while adhering to the principle that all of the district's students should have access to racially integrated schools of comparable quality. Over the past several decades, both Washington state and federal courts have, at every level, approved and even lauded the school board's continuing and evolving efforts to attain and maintain a desegregated system.

The school board has not yet achieved its ultimate goal of offering the best possible education in all of its high schools. Despite the district's efforts, it remains a stark reality that disproportionately, the schools located in the northern end of the city continue to be the most popular and prestigious, and competition for assignment to those schools is keen. The school board has decided that in order to afford all of the city's students—including those

from predominantly minority south Seattle—access to these more popular schools, it must employ a tiebreaker mechanism that elevates race over proximity to determine who may attend these schools.

Since 1998, the Seattle School District has assigned students to its regular ten high schools according to an "open choice" policy, by which students throughout the district list which high school they would like to attend in order of preference. The district will assign the student, if possible, to the high school listed as his or her first choice. Five of the district's high schools, however—Ballard, Nathan Hale, Roosevelt, Franklin, and Garfield—are listed as a first choice by more students than they can accept.[1] Approximately 82% of students entering high school in 2000 selected one of these five schools as a first choice. The school district·allocates the available spaces in these oversubscribed high schools by using a series of tiebreakers. The first tiebreaker asks whether the student has a sibling already attending his or her first-choice school. For the stated purposes of "achieving diversity, limiting racial isolation, and providing an equal opportunity to receive a quality education," the district will, if necessary, use a second tiebreaker for those oversubscribed high schools that are racially "out of balance," selecting for placement students whose race will help mitigate the imbalance of the racial makeup of the chosen school. Defendants' Memo in Support of Partial Summary Judgment on State Law Claim at 2.

The school district has determined that a school is out of balance if it deviates by more than 15% from the overall racial breakdown of the population of students attending Seattle's public schools, which is currently approximately 40% white and 60% nonwhite.[2] Of the oversubscribed high schools, only Garfield is currently considered in balance.[3] The district estimates that without the integration tiebreaker, the nonwhite populations of the 2000–2001 ninth grade class at Franklin would be 79.2%; at Hale 30.5%; at Ballard 33%; and at Roosevelt 41.1%. Using the integration tiebreaker mechanism, the nonwhite populations of the same schools respectively are 59.5%; 40.6%; 54.2%; and 55.3%.[4] Under the plan's most recent revision, the integration tiebreaker will be turned off once the entering class is brought into racial balance, and the district will turn to the third tiebreaker, proximity of the student's home to the school of choice, or the fourth tiebreaker, a lottery, to determine the remaining placements.

Plaintiffs, a group of parents whose children were not, or may not be, assigned to a high school of their choice under the assignment plan using the racial integration tiebreaker, claim that use of the tiebreaker violates the Washington Civil Rights Act (the "Act," the "Initiative," or "Initiative 200") (codified at RCW 49.60.400), the Equal Protection Clause of the Fourteenth Amendment to the United

---

1. Fewer than 20% of the district's students listed one of the five remaining high schools— Cleveland, West Seattle, Sealth, Rainier Beach and Ingraham—as a first choice. As a result, a student wishing to attend one of these schools will in all likelihood be given his or her first choice.

2. In November 2000, the district adopted the 15% variance policy. For assignments made for the 1999–2000 school year, the district

was still using a 10% variance to measure racial balance.

3. Under the new 15% band, Roosevelt will no longer be out of balance.

4. Eighty-nine more white students were assigned to Franklin than would have been absent the tiebreaker; 82 more nonwhite students to Roosevelt; 107 more nonwhite students to Ballard, and 27 more nonwhite students to Hale.

States Constitution, and Title VI of the federal Civil Rights Act of 1964.

## II. DISCUSSION

### A. *State Law Claim: Initiative 200*

Guided by the principle that a court should avoid deciding a matter on federal constitutional grounds if state law grounds are available, the parties, in their cross motions for summary judgment, have asked the court to make an initial determination of the effect of Initiative 200 on the district's open choice policy. Plaintiffs contend that the Initiative outlaws the use of a racial tiebreaker in school assignments. Defendants argue that this provision should not be construed to outlaw the tiebreaker program, and in the alternative, that if it must be so construed, the Initiative is unconstitutional under both the Washington state and the United States constitutions.

In 1998, Washington voters passed Initiative 200, the Washington Civil Rights Act. The Act declares that state government, including local school districts, may not "discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of ... public education." RCW 49.60.400. Because the statute has not yet been interpreted by the Washington state judiciary, this court has the task of predicting how the state's highest court would apply the Act to this case. *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

 The court has a duty to construe Initiative 200, if possible, in a way that makes the initiative consistent with the state and federal constitutions; "where a statute is susceptible of several interpretations, some of which may render it unconstitutional, the court, without doing violence to the legislative purpose, will adopt a construction which will sustain its consti-

tutionality if at all possible to do so." *In re Cross,* 99 Wash.2d 373, 382–83, 662 P.2d 828 (1983). As discussed below, applying Initiative 200 to outlaw the school district's integration plan would render the Act unconstitutional. The definitions of "preference" and "discrimination" provided in Washington and federal case law, however, furnish a reasonable saving construction that renders a finding of unconstitutionality unnecessary.

### 1. *Application of Initiative 200 to the Open Choice Policy Would Impermissibly Effect an Amendment to the Washington Constitution*

 It is an established principle under Washington law that the legislature, or the people acting in their legislative capacity, may not amend the state constitution except by a special process. As recently noted in *Gerberding v. Munro,* Washington courts "have often stated the initiative process, as a means by which the people can exercise directly the legislative authority to enact bills and laws, is limited in scope to subject matter which is legislative in nature.... Thus, the initiative power may not be used to amend the Constitution." 134 Wash.2d 188, 210 n. 11, 949 P.2d 1366 (1998) (citations omitted). An amendment to the constitution may be effected only "through the process for constitutional amendment articulated in Wash. Const. art. XXIII." *Id.* at 211, 949 P.2d 1366. If plaintiffs' construction of Initiative 200 constitutes an amendment to the Washington Constitution, the court must either fashion a reasonable saving construction or find the initiative unconstitutional.

The Washington Constitution, article IX § 1 provides, "it is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference

on account of race, color, caste or sex." The section following states, "the legislature shall provide for a general and uniform system of public schools." Washington case law has construed the language of these two sections separately and in concert to require school districts to provide equal educational opportunity to students of all races, to limit racial isolation, and to provide a racially and ethnically diverse educational experience. The provisions have also been construed to authorize local school boards to implement race-conscious measures to effectuate this policy.

A number of Washington court cases refer to school districts' constitutionally-derived authority or duty to operate integrated schools. In *Seattle Sch. Dist. No. 1 v. Washington*, Judge Doran found that "[s]egregated schools are prohibited by Article IX, Section 1, of the Constitution," and that "[a] racially segregated education is inadequate to equip students, especially minority students, with basic educational skills and with the ability to participate effectively in our open political system and in the labor market." No. 81–2–1713–1, Findings of Fact and Conclusions of Law, Madden Decl., Exh. 2 at 68–69. The Washington Supreme Court has also found that it is "the duty of the school board to act in the best interests of the majority of students," even if to do so would be to the detriment of some students. *Citizens Against Mandatory Bussing v. Palmason*, 80 Wash.2d 445, 457, 495 P.2d 657 (1972).

■ That court went on to find that to limit the authority of school boards by not allowing them to take race into account in efforts to desegregate their schools "would frustrate the purpose of Const. art. 9, § 1 . . . and of section 2 thereof." *Palmason*, 80 Wash.2d at 449, 495 P.2d 657. In that case, the Washington Supreme Court refused to authorize a referendum on the Seattle School District's race-conscious policy of transferring students to non-neighborhood schools in an effort to reduce the effect on schools of residential segregation. The court found that to do otherwise would unduly limit the district's constitutional mandate to provide equal educational opportunity to all of its students. In *Dawson v. Troxel*, the Washington appellate court reiterated that "in some circumstances a racial criterion *may* be used—and indeed in some circumstances *must* be used—by public educational institutions in bringing about racial balance." 17 Wash.App. 129, 132, 561 P.2d 694 (1977), quoting *DeFunis v. Odegaard*, 82 Wash.2d 11, 27, 507 P.2d 1169 (1973).[5] The Washington Constitution, therefore, imposes a duty on school boards to operate racially integrated schools, and recognizes the reality that in some cases, to fulfill that duty, a school board may need to take race into account.

Plaintiffs argue that the Washington Constitution merely grants school districts the authority to use their discretion in operating their schools, and that the legislature (or the people acting in their legislative capacity) may limit that discretion however it sees fit. They offer as an analogy that school boards would not be permitted to thwart a legislative enactment requiring all schools to offer a course in American history, or prohibiting smoking on school grounds. This analogy is flawed. Washington courts have not found that freedom not to take a course in American history, or license to smoke on school grounds, is a right conferred by the state's constitution. Access to equal educational opportunity, however, is. The authority to

---

5. *DeFunis* analyzed to what extent the state could use race-conscious measures under the Fourteenth Amendment, and the quotation refers in the *DeFunis* context to situations in which *de jure* segregation had occurred in the past. *Dawson*, however, did not limit its use of the *DeFunis* principle to that context.

use race to provide "a general and uniform system of public schools," a phrase the courts have construed to mean racially integrated schools, is an authority derived directly from the Washington Constitution. An initiative effecting an amendment to this authority would be unconstitutional under Washington law.

### 2. Pre–Initiative 200 Meaning of "Discrimination" and "Preferential Treatment" Under Washington Law

The court need not (nor would it be permitted to) contort the language of Initiative 200 in order to give it a saving construction. Washington case law offers long-established and reasonable definitions of racial "discrimination" and "preference" which, applied to Initiative 200, exempt the school board's tiebreaker program.

Article IX § 1 of the Washington Constitution requires the state to operate public schools "without distinction or preference on account of race." At the same time, Washington state courts have consistently held that a school board's race-conscious assignment policy will *not* constitute a "preference" or "discrimination" when instituted to accomplish school integration. Presuming, as the court must, that Washington courts have adjudicated these matters consistent with the Washington Constitution, and specifically with article IX, the court finds that despite the fact that the school board's tiebreaker program takes race into account, case law dictates that the program does not constitute a "preference" or "discrimination" based on race under Initiative 200.

■ *Citizens Against Mandatory Bussing v. Brooks* involved a mandamus action in which a coalition asked the court to initiate a recall of school board members, charging that the "race of the students was the criterion used to determine which students in the school district would be transferred and which schools they would

attend, contrary to the Constitution of the State of Washington." 80 Wash.2d 121, 126, 492 P.2d 536 (1972). Rejecting this charge, the Washington Supreme Court upheld the Seattle School District's authority to adopt measures, designed to mitigate *de facto* segregation, that were not required by the Fourteenth Amendment. In doing so, the court drew on *Swann v. Charlotte–Mecklenburg Bd. of Educ.* for the proposition that while *courts* are limited in their powers to impose desegregation measures, and may do so only to remedy those constitutional violations arising from a state actor's *de jure* segregation, *school boards* may exercise a wider latitude in voluntarily adopting desegregation measures. 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The Washington Supreme Court upheld the Seattle School District's right to make race-based distinctions, and found that the district's race-conscious busing measures did not violate the Washington Constitution, including, this court must presume, article IX § 1. Article IX § 1, therefore, which outlaws preferences meted out on racial grounds, does not to apply to the school board's voluntary race-conscious efforts to integrate Seattle's high schools. Later that year the Washington Supreme Court reiterated its *Brooks* holding, deeming the procedure by which the school board implemented a mandatory race-based busing policy "a reasonable one, by any definition of that term." *Citizens Against Mandatory Bussing v. Palmason,* 80 Wash.2d 445, 451, 495 P.2d 657 (1972). Again, the finding came against the backdrop of the Washington Constitution. Five years later, as the court has already discussed, Judge Farris in *Dawson v. Troxel* emphasized the principle that "in some circumstances a racial criterion *may* be used— and indeed in some circumstances *must* be used—by public educational institutions in bringing about racial balance." 17 Wash.

App. 129, 132, 561 P.2d 694 quoting *De-Funis v. Odegaard,* 82 Wash.2d 11, 27, 507 P.2d 1169 (1973).

### 3. *Definitions of "Preference" and "Discrimination" Under Federal Law*

■ Ninth Circuit precedent, which parallels Washington courts' definitions of "preference" and "discrimination," bolsters the conclusion that Initiative 200 does not apply to programs designed to overcome racially imbalanced schools. The Ninth Circuit has identified two different types of government programs that take race into account. On the one hand are "affirmative action" programs, such as those used in higher education admissions and contracting awards that use racial minority status as a positive factor, conferring a government benefit to members of a minority at the expense of those of the majority. On the other hand are measures, such as those designed to effect racially integrated public schools, that seek to ensure that a benefit, available to all, is distributed in a manner that the governing body has decided will benefit the citizenry as a whole. As stated in *Associated Gen'l Contractors of Calif. v. San Francisco Unified Sch. Dist.,*

> We think it is useful and necessary to distinguish between the two major types of positive governmental action taken on behalf of minorities. *First, there are "reshuffle" programs, in which the state neither gives to nor withholds from anyone any benefits because of that person's group status, but rather ensures that everyone in every group enjoys the same rights in the same place. The most common examples are school desegregation cases and programs.* Second, there are "stacked deck" programs, in which the state specifically favors

members of minorities in competition with members of the majority for benefits that the state can give to some citizens but not to all. This category includes affirmative action programs of both the quota and "positive-factor" varieties.

616 F.2d 1381, 1386 (9th Cir.1980) (citations omitted, emphasis added).

The Ninth Circuit recently reiterated this distinction in *Coalition for Economic Equity v. Wilson,* 122 F.3d 692 (9th Cir. 1997). In 1996, the voters of California ratified Proposition 209, amending the California Constitution [6] to include a provision identically worded to Initiative 200. The day after the election, a group of plaintiffs brought suit to enjoin the state from implementing the amendment. Plaintiffs argued, inter alia, that the proposition's elimination of the state's affirmative action and "preference" programs would "restructure[ ] the political process to disadvantage only those seeking to enact legislation intended to benefit minorities and women," *C.E.E. v. Wilson,* 946 F.Supp. 1480, 1499 (N.D.Cal.1996). Groups seeking to enact such programs before passage of Proposition 209 could petition the appropriate legislature; after Proposition 209, they would be forced to pass an amendment to the California Constitution. Thus, plaintiffs argued, the situation was indistinguishable from *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) and *Washington v. Seattle Sch. Dist. No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), in which the Supreme Court struck down initiatives that forced certain minority groups to petition for redress at higher, more remote levels of government.

Granting the injunction, the district court defined "preference" broadly, to "in-

**6.** Whether Proposition 209 effected an amendment to the California Constitution was not at issue in *C.E.E.* for, unlike Initiative 200, Proposition 209 evidently amended its state's constitution according to proper constitutional procedure.

clude[ ], at a minimum, programs or policies that use racial or gender classifications." 946 F.Supp. at 1489. The district court granted the injunction in part based on a finding that "Proposition 209's reach may extend beyond mere 'zero-sum' [i.e. stacked deck] antidiscrimination efforts." *Id.* at 1503 n. 24. The court couldn't rule out the possibility that the proposition might be construed to apply to school districts' use of measures designed to mitigate *de facto* racial isolation in schools, finding that "the measure could eliminate, or cause fundamental changes to, *voluntary desegregation programs run by school districts." Id.* at 1493–94 (some emphasis added). Thus construed, the plaintiffs had demonstrated a probability of success on their claim that the proposition was indistinguishable from the statutes the Supreme Court struck down in *Seattle* and *Hunter,* and therefore unconstitutional.

Proposition supporters, seeking to save it from constitutional infirmity, conceded on interlocutory appeal that the measure did *not* apply to voluntary school programs designed to ameliorate racial segregation, and was thus in fact distinguishable from the measures struck down in *Hunter* and *Seattle.* Appellants Governor Pete Wilson and Attorney General Dan Lungren stated that "the [amicus curiae] United States' claim that [Proposition 209] 'generally prohibits *race-conscious* busing programs designed to overcome *de facto* school segregation' is incorrect. *Busing programs do not involve preferences based on race."* Appellants' Reply Brief at 10, *C.E.E. v. Wilson,* 122 F.3d 692, Madden Decl., Exh. 1 (emphasis added).

The Ninth Circuit agreed. In vacating the district court's preliminary injunction, the court emphasized, in a footnote critical to the case's holding, that the district court erred in failing to distinguish school desegregation "reshuffling" programs from other affirmative action programs. The court reiterated the distinction made in *Associated Gen'l Contractors* and went on to add, "[u]nlike racial preference programs, school desegregation programs are not inherently invidious, do not work wholly to the benefit of certain members of one group and correspondingly to the harm of certain members of another group, and do not deprive citizens of rights." *C.E.E. v. Wilson,* 122 F.3d at 708 n. 16.[7]

Furthermore, a constitutionally-infirm contract procurement or university admissions policy grants preference only to nonwhites. The program at issue here falls *indiscriminately* on whites and nonwhites alike, ensuring a racially integrated system for the benefit of the school district as a whole. Even while the program allows minority students access to Ballard and Hale, Seattle's popular predominantly white schools, it also allows white students access to Franklin, the city's popular predominantly minority school. It is in this sense, too, that the program is not a "preference."

As the Washington Supreme Court has observed,

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society that each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within

---

7. The court accepts plaintiffs' assertion that students denied their choice of schools are deprived of curriculum advantages not necessarily available at other schools. However, maintaining a diversified school system is a step towards ensuring equal quality throughout the district.

the broad discretionary powers of school authorities.

*Brooks,* 80 Wash.2d at 128, 492 P.2d 536, quoting *Swann,* 402 U.S. at 16, 91 S.Ct. 1267. In fulfilling its constitutional mandate, the school board has found that it cannot provide an equitable and diverse educational opportunity to the district as a whole without depriving some students of access to their first choice. This is a proper exercise of the school board's discretion with which the courts may not interfere. As the *Palmason* court said, "the [members of a school board have a] duty ... to act in the best interests of the majority of students; and the fact that some students might suffer adverse effects was not a consideration which, in law, they were required to find controlling." 80 Wash.2d at 457, 495 P.2d 657.

It may be said, as plaintiffs do, that nonwhite children given spots at Nathan Hale and Ballard, or white children given spots at Franklin, are being granted a "preference" in common parlance. The term "preference," however, as used in the Washington Constitution and defined in state and federal law, and therefore necessarily as used in Initiative 200, has acquired a legally fixed meaning derived from dozens of years of race discrimination jurisprudence. Under that definition, the school board's program is *not* a preference.

### B. *Federal Claim: the Equal Protection Clause*

■ The parties do not dispute that because the district's open choice policy relies on racial classifications, the court must use strict scrutiny to analyze the plan's constitutionality. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 225–26, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). To survive strict scrutiny, the plan must 1) serve a compelling government interest and 2) be narrowly tailored to do so. *Id.* at 227, 115 S.Ct. 2097.

### 1. *Compelling Interest*

During one of its recent executive sessions, the school board issued the following "Board Statement Reaffirming Diversity Rationale:"

Diversity in the classroom increases the likelihood that students will discuss racial or ethnic issues and be more likely to socialize with people of different races. Diversity is thus a valuable resource for teaching students to become citizens in a multi-racial/multi-ethnic world.

Providing students the opportunity to attend schools with diverse student enrollment also has inherent educational value from the standpoint of education's role in a democratic society.... Diversity brings different viewpoints and experiences to classroom discussions and thereby enhances the educational process. It also fosters racial and cultural understanding, which is particularly important in a racially and culturally diverse society such as ours.

Based on the foregoing rationale, the Seattle School District's commitment is that no student should be required to attend a racially concentrated school. The District is also committed to providing students with the opportunity to voluntarily choose to attend a school to promote integration. The District provides these opportunities for students to attend a racially and ethnically diverse school, and to assist in the voluntary integration of a school, because it believes that providing a diverse learning environment is educationally beneficial for all students.

Minutes of Executive Session of the Board of Directors, November 17, 1999, Taylor Decl., Exh. 3 at 12.

There is no evidence, nor do plaintiffs claim, that the school board adopted the plan for any other reason than as stated

above. Thus, succinctly stated, the board's purpose in adopting its current open choice policy is to mitigate the historical effects on its high schools of the residential segregation of Seattle's neighborhoods, and to allow all students the opportunity to benefit from the pedagogical and socio-cultural values a racially diverse school offers. The court must evaluate against the backdrop of existing legal precedent whether this interest is compelling.

a. *The School Board has Authority to Cure De Facto Segregation*

Plaintiffs argue that the integration-positive tiebreaker does not serve a compelling interest. Plaintiffs claim first that the Supreme Court has foreclosed the possibility that a government actor can use race for any reason other than to remedy past acts of *de jure* discrimination, citing the Court's holding in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). *Croson* found that the only justification for Richmond's use of racial quotas in the city's contract procurement process would be a showing that racial quotas were necessary to remediate the effects of past discrimination by the city. As the Second Circuit has pointed out, however, "*Croson* does not reach the issue of whether a non-remedial purpose could constitute a compelling government interest, because the classification at issue in *Croson* was only defended as necessary to remedy past discrimination." *Brewer v. West Irondequoit Cent. Sch. Dist.,* 212 F.3d 738, 748 (2nd Cir.2000). *Croson*'s holding, therefore, cannot be extended to address the question currently before the court, for the school board does not claim that the tiebreaker is meant to remedy past *de jure* discrimination, but to cultivate diversity and enhance the educational opportunity available to all its students by achieving an integrated system.

Plaintiffs claim that similarly, the Supreme Court in *Wygant v. Board Of Educ.,* when evaluating a school board's use of a race-based layoff program designed to increase the minority faculty presence, indicated that the Equal Protection Clause required "some showing of prior discrimination by the governmental unit involved," 476 U.S. 267, 276, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986)(plurality opinion). In her concurring opinion, however, Justice O'Connor clarified that "certainly nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts but which have not been passed on here to be sufficiently ... 'compelling' to sustain the use of affirmative action policies." *Id.* at 286, 106 S.Ct. 1842 (O'Connor, J., concurring).

The Second Circuit has gone so far as to explicitly reject application of the reasoning of *Croson* and *Wygant* to the school desegregation context.

Neither case ... involved desegregation of a student population in the public school system, a goal that we may assume at this point in the proceedings is more compelling than reduction of racial isolation or underrepresentation in the commercial context [of] teachers' jobs and the construction industry at issue in *Wygant* and *Croson.* Further, the danger identified by the Supreme Court as inherent in non-remedial based programs, *see Croson,* 488 U.S. at 498, 109 S.Ct. 706 ("a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy"), is not present when a local school board acts to remedy clearly identifiable, indeed obvious, racial isolation in particular school districts.

*Brewer,* 212 F.3d at 751 (some citations omitted). The *Brewer* court's analysis supports the conclusion that the *Croson* line of cases does not control the question currently before the court.

Absent a Supreme Court or Ninth Circuit [8] holding that a government entity must establish past *de jure* discrimination to justify the use of race in this context, then, the court must evaluate whether promoting racial integration may be a compelling government reason for using race in secondary school assignment plans. While plaintiffs have argued that Supreme Court cases have foreclosed this possibility, the court finds, to the contrary, that the Supreme Court has long suggested quite the reverse:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society, each school should have a prescribed ratio of Negro to white students reflecting the proportion of the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities.

*Swann v. Charlotte–Mecklenburg Bd. Of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The Supreme Court clarified that *Swann* was not merely intended to apply to situations in which there had been a constitutional violation, when it declared in a companion case that "as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitu-tional requirements." *North Carolina Bd. of Educ. v. Swann,* 402 U.S. 43, 45, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971). A number of other Supreme Court cases declare the same principles. In *Washington v. Seattle Sch. Dist. No. 1,* the Supreme Court reinstated the authority of the Seattle School District to bus students to help cure *de facto* racial imbalance, arising where "segregated housing patterns ... created racially imbalanced schools." 458 U.S. 457, 460, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). In his concurring opinion in *Keyes v. School Dist. No. 1,* Justice Powell declared, "[s]chool boards would, of course, be free to develop and initiate further plans to promote school desegregation.... Nothing in this opinion is meant to discourage school boards from exceeding minimal constitutional standards in promoting the values of an integrated school experience." 413 U.S. 189, 242, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). In *Bustop, Inc. v. Board of Educ.,* plaintiffs asked the federal courts to stay an order issued by the California Supreme Court that would have implemented a race-based desegregation plan. Then–Justice Rehnquist wrote,

> [plaintiffs'] argument is indeed novel, and suggests that each citizen ... has a 'federal right' to be 'free from racial quotas....' While I have the gravest doubts that the Supreme Court of California was *required* by the United States Constitution to take the action that it has taken in this case, I have very little doubt that it was *permitted* by that Constitution to take such action.

439 U.S. 1380, 1381, 99 S.Ct. 40, 58 L.Ed.2d 88 (1978). Thus, the Supreme

---

8. Plaintiffs cite *Ho v. San Francisco Unified Sch. Dist.* for the proposition that "[t]he perilous undertaking of employing race as a remedy must be justified by the defendants as alleviating a violation of the Constitution." 147 F.3d 854, 865 (9th Cir.1998). In that case, however, defendants did not proffer di-versity as the interest in using race in the school board's assignment plan, relying instead on continuing adherence to a fifteen-year-old consent decree that had been entered into in an effort to reduce the effects of segregation. The Ninth Circuit's admonition in *Ho* is, therefore, highly case-specific.

Court has repeatedly recognized the authority of school boards, (while repudiating that of courts), to take measures to integrate *de facto* segregated districts beyond what the Constitution requires.[9]

The circumstances that gave rise to the court-approved school assignment policies of the 1970's continue to be as compelling today as they were in the days of the district's mandatory busing programs. As the federal district court found in *Seattle School Dist. No. 1 v. State,* later upheld by the Supreme Court, "segregated housing patterns exist in the City of Seattle. These housing patterns result in racially imbalanced schools when a neighborhood school assignment policy is implemented." 473 F.Supp. 996 (W.D.Wash.1979). The defendants have established that housing patterns in Seattle continue to be racially concentrated. *See* Lewis Second Supplemental Declaration, Exh. A–1. Absent a Supreme Court or Ninth Circuit directive on point, it would defy logic for this court to find that the less intrusive programs of today violate the Equal Protection Clause while the more coercive programs of the 1970's did not.

b. *Seattle School District's Diversity Interest*

Plaintiffs claim that defendants' tie-breaker uses race, and only race, in moving towards its diversity goal. Therefore, plaintiffs argue, the district's asserted diversity interest is not compelling because Justice Powell's opinion in *Bakke* sanctioned the use of race to create a diverse educational environment only if it were one criterion among several. *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Plaintiffs cite Justice Powell's distinction between racial or ethnic diversity and "genuine diversity," which would include a whole range of factors, and his observation that a "special admission program [that focuses] *solely* on ethnic diversity would hinder rather than further attainment of genuine diversity." *Id.* at 315, 98 S.Ct. 2733.

*Bakke*'s limit on the exclusive use of race to create a diverse environment does not speak to the question before the court. As the Second Circuit has found, "*Bakke* ... is not directly on point as it expressed no opinion as to the compelling interest of reducing racial isolation in elementary public school education." *Brewer,* 212 F.3d at 751. Interests asserted at the higher education level carry much different implications than those asserted at the elementary and secondary school level. This difference arises because, as the Supreme Court has recognized, "[e]ducation has come to be a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him adjust normally to his environment." *Seattle Sch. Dist. No.1,* 458 U.S. at 472–73, 102 S.Ct. 3187. Justice Powell's observations therefore do not apply as forcefully in the earlier stages of a child's education.

Achieving racial diversity and mitigating the effects of *de facto* residential segregation are, the court finds, compelling government interests as a matter of law. In deference to the authority vested in the school district under the Washington Constitution, the court will ask only whether the board had a sufficient basis for adopting a plan to achieve a goal found to be

9. As discussed above, the Seattle School District operates under authority granted by the Washington Constitution. Washington state courts have long held that a school district has authority under state law to take race into account in order to maximize its students' educational opportunities. *See, e.g., Citizens Against Mandatory Bussing v. Brooks,* 80 Wash.2d 121, 492 P.2d 536 (1972); *Citizens Against Mandatory Bussing v. Palmason,* 80 Wash.2d 445, 495 P.2d 657 (1972).

compelling as a matter of law.[10] *See Wygant,* 476 U.S. at 277–78, 106 S.Ct. 1842.

Plaintiffs claim that "diversity" as a goal must be more than an attractive generality. *See Wessmann v. Gittens,* 160 F.3d 790, 800 (1st Cir.1998). The school board, through its expert Dr. Trent, identifies four discrete reasons why racial balance at the high school level is important:

■ Opportunity and achievement. The research shows that a desegregated educational experience opens opportunity networks in the areas of higher education and employment, particularly for minority students, which do not develop when students attend less integrated schools....

■ Teaching and learning. The research shows that academic achievement of minority students improves when they are educated in a desegregated school, likely because they have access to better teachers and more advanced curriculum. The research also shows that both white and minority students experienced improved critical thinking skills—the ability to both understand and challenge views which are different from their own—when they are educated in racially diverse schools.

■ Civic values. The research clearly and consistently shows that, for both white and minority students, a diverse educational experience results in improvement in race-relations, the reduction of prejudicial attitudes, and the achievement of a more democratic and inclusive experience for all citizens.... Recent research has identified the critical role of early school experiences in breaking down racial and cultural stereotypes....

■ Employment. Research ... shows that, as a group, minority students who exited desegregated high schools were more likely to be employed in a racially diverse workplace, obtained more prestigious jobs than those who did not, and that their jobs tended to be higher paying than those students who did not attend desegregated schools.

Trent Decl. ¶ 4.

Although Dr. Armour, plaintiffs' expert, takes issue with many of the conclusions of defendants' expert, his contravening testimony fails to cast doubt on the fact that the school board had a sufficient basis for believing diversity and integration were important goals. Indeed, Dr. Armour concedes that "[t]here is general agreement by both experts and the general public that integration is a desirable policy goal mainly for the social benefit of increased information and understanding about the cultural and social differences among the various racial and ethnic groups." Armor Dep. at 23–24, Madden Decl., Exh. 1. The court finds, given the testimony of both parties' experts, that as a matter of law defendants have established that they had a sufficient basis for implementing the integration-positive tiebreaker for the actual purpose of achieving diversity and reducing the effects of *de facto* segregation in the Seattle School District.

2. *Narrowly Tailored*

Defendants have established that their race-conscious policy was implemented to

---

**10.** Plaintiffs cite *Ho* for the proposition that the burden of justifying use of race in the school plan falls on defendants: "Once the plaintiffs established the School District's use of racial classifications ... the School District has the duty to justify them." 147 F.3d at 865. This language does not, however, shift the ultimate burden of proof to defendants. According to standard Equal Protection methodology, once a defendant has asserted a compelling government interest, the burden of proving a constitutional violation returns to plaintiffs. *See Wygant,* 476 U.S. at 277–78, 106 S.Ct. 1842.

further a compelling interest. Plaintiffs argue that defendants' open choice plan, which at some point in the assignment process takes only race into account, is mere "racial balancing" and as such cannot, as a matter of law, be narrowly tailored to serve a compelling government interest. As support for this proposition plaintiffs cite *Eisenberg v. Montgomery County Public Schools,* 197 F.3d 123 (4th Cir.1999); *Tuttle v. Arlington County. Sch. Bd.,* 195 F.3d 698 (4th Cir.1999); and *Wessmann v. Gittens,* 160 F.3d 790. In each of these cases, the defendants used race-conscious integration programs that sought to achieve a racial balance that reflected the overall demographic of the district. The defendants asserted a compelling interest in fostering diversity in their schools. The appellate courts rejected this interest because the "racial balancing" programs were designed to achieve only *racial* diversity, as opposed to the "genuine diversity" sanctioned by Justice Powell in *Bakke.* The programs were not, therefore, permitted by the Fourteenth Amendment. Relying on these holdings, plaintiffs here argue that the only diversity the tiebreaker mechanism promotes is *racial* diversity, and as such is indistinguishable from the "racial balancing" that the courts in *Tuttle, Eisenberg,* and *Wessmann* found unconstitutional.[11]

The court finds, however, that defendants' interest here is not only to promote diversity for educational and social value; they have also established that they seek to ameliorate the *de facto* effects of residential segregation in Seattle. It is uncontroverted that 74% of Asian American students, 84% of African American students, 65% of Hispanic students, and 51% of Na-

tive American students live south of a line somewhere slightly north of the downtown area. *See* Lewis Sec. Supp. Decl., Exh. A–1. As defendants point out, this demographic distribution strongly suggests that were geography alone to determine school assignment, the district would be highly segregated into white and nonwhite schools. *Id.* Were the school district to stop taking race into account in its school assignment policy, it seems inevitable that the district's schools, over the course of the next few years, would revert to their pre-existing "natural state" of racial segregation.

Preventing the re-segregation of Seattle's schools is, as discussed above, a compelling interest. The Second Circuit has highlighted the error in modeling a narrow tailoring analysis on a "diversity" rationale alone in cases in which a district has asserted a legitimate and compelling desegregation rationale:

We recognize that [in enjoining the school district's use of race in its transfer policy] the District Court did conduct a narrow tailoring analysis. We believe, however, that it focused on the wrong question: the District Court asked whether the Program is narrowly tailored to achieve the goal of "true diversity," when the appropriate inquiry, as evident from our discussion in the preceding sections, is whether the Program is narrowly tailored to achieve its primary goal of reducing racial isolation resulting from *de facto* segregation. The difference in these two frameworks is not mere semantics. If reducing racial isolation is standing alone a constitutionally permissible goal, as we have

---

**11.** It is axiomatic that these cases are not binding precedent in the Ninth Circuit. This circuit has been more circumspect on the subject of "racial balancing," upholding a school board's right to maintain a race-based layoff plan for the purpose of reflecting the racial demographic of the district, and finding that "[t]he school district is not precluded from taking voluntary action to obtain better racial balance in its teaching faculty." *Zaslawsky v. Board of Educ.,* 610 F.2d 661, 664 (9th Cir.1979).

held it is ... then there is no more effective means of achieving that goal than to base decisions on race. "True diversity," on the other hand, may certainly be defined more broadly than race. *See Bakke*, 438 U.S. at 315, 98 S.Ct. 2733. Indeed, the cases cited by the District Court in support of its decision that the use of race alone in the Program was not narrowly tailored, ... *Wessmann, Bakke,* and *Hopwood* [ ], only address the efficacy of employing strictly racial classifications to achieve "true diversity." Those decisions are, therefore, inapplicable to the present situation where the Program's aim, as initially found by the District Court and affirmed by this Court today, is precisely to ameliorate racial isolation in the participating districts.

212 F.3d at 752–53 (some citations omitted). Thus the Second Circuit has pointed out the error of relying on *Wessmann* and its progeny for the proposition that exclusive reliance on race in a school assignment plan—"racial balancing"—is not narrowly tailored to achieve diversity in school assignments. Those cases misapprehended the importance of the other interest asserted here, integration of a *de facto* segregated system, on the narrow tailoring analysis. It bears repeating that the Second Circuit found that "[i]f reducing racial isolation is standing alone a constitutionally permissible goal, as we have held it is ... then there is no more effective means of achieving that goal than to base decisions on race."

This court agrees with the Second Circuit that the *Wessmann* line of cases misconstrued Supreme Court directives regarding the proper deference a court should grant to a local school board's authority to ameliorate the effects of *de facto* segregation. In *Brewer,* the Second Circuit addressed the *Wessmann* court's reasoning:

In rejecting the [defendant] Boston Latin School's argument that it was attempting to alleviate vestiges of past discrimination, *Wessmann* relies, we think wrongly, on Supreme Court precedent which holds merely that absent a finding of a constitutional violation, a school district is under no obligation, enforceable by a federal court, to remedy the imbalance. *The absence of a duty sheds little light on the constitutionality of a voluntary attempt.*

212 F.3d at 751 (citations omitted, emphasis added). The *Brewer* analysis of *Wessmann* applies equally to *Tuttle* and *Eisenberg.*

The school district contends that to further its interest of providing racially diverse schools and mitigating the effects of racial segregation, it must take race into account. This conclusion is fully grounded in reason and supported by the parties' experts. As plaintiffs' expert has conceded, "if you don't consider race, it may not be possible to offer an integrated option to students." Armor Dep. at 60, Madden Decl., Exh. 1.

None of plaintiffs' other criticisms of the open choice policy call into doubt defendants' assertion that it is narrowly tailored. Plaintiffs claim there is no "end point," or "sunset provision," but the integration-positive tiebreaker applies only to schools deemed out of balance. Once a school is considered in balance (as is Garfield), the board will abandon the use of race in its assignments to that school. In addition, under the newly-revised plan, the district switches off the racial tiebreaker as soon as an entering class comes into balance, and will not use race to assign the remaining spaces in that school.

The plan does not mandate a specific racial quota. Instead, the plan uses the 60/40 ratio as a floor, and allows a significant 15% deviation from those numbers

before it will take race into account. This mechanism is designed to prevent the city's segregated housing patterns from totally dictating the racial makeup of the district's popular schools. While the board has considered adopting a deviation of 20%, that option was rejected because it would have left "only one, and possibly . . . no" high schools out of balance, rendering the integration plan virtually ineffectual. Schaad–Lamphere Dep. at 86–87, Madden Decl., Exh. 2.

The school district has a demonstrated history of reducing the use of race in its assignment plans, as the mandatory busing plans of the 1970's have given way to the more choice-oriented plans of the 1990's and of this century. Preston Dep. at 83–85., Madden Decl., Exh. 3. Indeed, the school district recently revised a number of facets of the open choice policy in November 2000, increasing the allowable deviation from the 60/40 ratio from 10% to 15%; adopting the "off-switch" for the tie-breaker once an entering class comes into balance; and limiting application of the tiebreaker to students entering ninth grade. These changes are further evidence that the board is responsive to its constituency and will, where feasible, consider alternatives that are less burdensome.[12] The school district has a demonstrated history of, and concrete plans for, revisiting the necessity of the use of race on a frequent and regular basis. In particular, defendants claim that in the future, the school board hopes to achieve and maintain diversity through entirely voluntary measures, by developing programs and making renovations designed to attract a broad array of students to all of its high schools.

Finally, as the court has observed, the defendants' policy is a "deck-shuffle" as defined by the Ninth Circuit, and as such does not, strictly speaking, prefer one race over any other. All children in the district are subject to the plan, and children of all races may attend at least one of the district's popular schools. At the same time, the plan maximizes the effect students' choices have on their assignments. These facts render the open choice policy in stark contrast to the court-sanctioned mandatory busing plans of earlier decades.

Defendants have presented sufficient evidence that a less burdensome plan would not, at this time, produce the degree of integration necessary to achieve their goals. The court finds therefore that defendants have established that their plan is narrowly tailored to further the compelling interests asserted in this case.

## III. CONCLUSION

The court's ruling recognizes that even as the Seattle School District works to improve the programs and facilities at the weaker schools, it must be allowed to provide all of Seattle's students the equal opportunity, as the Washington Constitution mandates, to attend the city's more popular schools. It may be true that the school board's measures cause dissatisfaction to some. Many of the south-end schools continue to offer less attractive programming and facilities, and as this lawsuit highlights, some students will not be allowed to attend the high school of their choice. It is within the board's discretion, however, as to how best it may achieve its legitimate and constitutionally-derived mandate.

---

**12.** Plaintiffs ask the court for a declaratory judgment that the plan before these changes were made was also unconstitutional. The court finds that since the district has abandoned that plan with no indication it intends to return to it, that plan is not currently an issue before the court.

Because applying Initiative 200 to outlaw the Seattle School District's racial tiebreaker would render the Act unconstitutional, and because both Washington and federal law provide long-established and reasonable bases for a saving construction, the court holds that Initiative 200 does not prohibit the district's continued use of the open choice policy's integration tiebreaker. Defendants' motion for partial summary judgment on plaintiffs' state law claims is therefore GRANTED. Plaintiffs' cross motion for partial summary judgment on the same question is DENIED.

The court also finds that defendants' use of race in its open choice policy tiebreaker serves a compelling government interest and is narrowly tailored to do so. Defendants' motions for summary judgment on plaintiffs' federal law claims are therefore GRANTED. Plaintiffs' motion for summary judgment on the same is DENIED.