294 F.3d 1085
PARENTS INVOLVED IN COMMUNITY SCHOOLS, a Washington nonprofit corporation, Plaintiff-Counter-Defendant-Appellant,v.SEATTLE SCHOOL DISTRICT, NO. 1, a political subdivision of the State of Washington; Joseph Olchefske, in his official capacity as superintendent; Barbara Schaad-Lamphere, in her official capacity as President of the Board of Directors of Seattle Public Schools; Donald Neilson, in his official capacity as Vice President of the Board of Directors of Seattle Public Schools; Steven Brown; Jan Kumasaka; Michael Preston; Nancy Waldman, in their official capacities as members of the board of Directors, Defendants-Counter-Claimants-Appellees.
No. 01-35450.
United States Court of Appeals, Ninth Circuit.
Filed June 17, 2002.

Before: REAVLEY,* O'SCANNLAIN, and GRABER, Circuit Judges.

ORDER

1
We certify to the Washington Supreme Court the question set forth in Part III of this order.

2
Further proceedings in this court are stayed pending receipt of the answer to the certified question. This case is withdrawn from submission until further order of this court or an order declining to accept the certified question. If the Washington Supreme Court accepts the certified question, the parties shall file a joint report six months after date of acceptance and every six months thereafter, advising us of the status of the proceeding.

3
* At oral argument before this court, the parties unanimously requested that we not certify this state law question to the Washington Supreme Court, but instead, decide the issue expediently so that school assignments for the 2002-03 school year could be made accordingly. We did so, and issued an opinion. See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 285 F.3d 1236 (9th Cir.2002); see also id. at 1243 n. 7. ("Neither party has suggested that we certify a question to the Washington Supreme Court. Indeed, in response to questions from the bench during oral argument, both parties urged us not to do so. Because we believe that the answer under Washington law is clear, we have not exercised our discretion to certify a question.").

4
After we rendered our decision, rehearing and rehearing en banc were sought. It has become clear that our court cannot provide a definitive answer before assignments must be made for the 2002-03 year, and therefore, we believe that our sole reason for not certifying this question to the Washington Supreme Court has dissolved. Moreover, we note that we may exercise our discretion to certify the question "upon [our] own motion." Wash. Rev. Code § 2.60.030(1). Indeed, even when we find the plain language of state law dispositive, see Parents Involved, 285 F.3d at 1243 n. 7, we have an obligation to consider whether novel state-law questions should be certified—and we have been admonished in the past for failing to do so. Arizonans for Official English v. Arizona, 520 U.S. 43, 62, 76-79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Consequently, after due consideration of the arguments raised in the petition for rehearing and the response thereto, we have decided that, in the present circumstances, certification is the most prudent course. Accordingly, we are filing today a separate order granting the petition for rehearing, withdrawing our prior opinion, and vacating the injunction issued under that opinion, see Parents Involved, 2002 WL 841345 (9th Cir. Apr. 26, 2002).

5
Pursuant to Washington Revised Code § 2.60.020, a panel of the United States Court of Appeals for the Ninth Circuit, before which this appeal is pending, certifies to the Washington Supreme Court a question of law concerning the proper interpretation of Washington Revised Code § 49.60.400. No published decision of either the Washington Supreme Court or the Washington appellate courts has yet construed this statute, and the answer to the certified question "is necessary ... to dispose of" this appeal. Wash. Rev.Code § 2.60.020. We respectfully request that the Washington Supreme Court answer the certified question presented below. Our phrasing of the issue is not meant to restrict the court's consideration of the case; "[w]e acknowledge that the Washington Supreme Court may, in its discretion, reformulate the question[]." Broad v. Mannesmann Anlagenbau AG, 196 F.3d 1075, 1076 (9th Cir.1999). If the Washington Supreme Court declines certification, we will resolve the issue according to our perception of Washington law.

II

6
Parents Involved in Community Schools (the "Parents"), a Washington nonprofit corporation, is deemed the petitioner in this request because the Parents appeal the district court's ruling on this issue. The caption of the case is:

7
PARENTS INVOLVED IN COMMUNITY SCHOOLS, a Washington nonprofit corporation, Plaintiff-counter-defendant-Appellant,

8
v.

9
SEATTLE SCHOOL DISTRICT, NO. 1, a political subdivision of the State of Washington; JOSEPH OLCHEFSKE, in his official capacity as superintendent; BARBARA SCHAAD-LAMPHERE, in her official capacity as President of the Board of Directors of Seattle Public Schools; DONALD NEILSON, in his official capacity as Vice President of the Board of Directors of Seattle Public Schools; STEVEN BROWN; JAN KUMASAKA; MICHAEL PRESTON; NANCY WALDMAN, in their official capacities as members of the board of Directors, Defendants-counter-claimants-Appellees.

10
* * *

11
The names and addresses of counsel for the parties are as follows:

12
Daniel B. Ritter & Harry J.F. Korrell (argued), Davis Wright Tremaine, LLP, Seattle, WA, for Plaintiff-counter-defendant-Appellant.

13
Michael Madden & Carol Sue Janes, Bennett, Bigelow & Leedom, P.S., Seattle, WA; Mark S. Green, Office of the General Counsel, Seattle School District No. 1, Seattle, WA, for Defendants-counter-claimants-Appellees.

14
Sharon L. Browne, Pacific Legal Foundation, Sacramento, California; Russell C. Brooks, Pacific Legal Foundation, Bellevue, WA, for amici curiae American Civil Rights Institute, American Civil Rights Union, Center for Equal Opportunity, and Pacific Legal Foundation.

15
Paul J. Lawrence, Preston, Gates & Ellis LLP, Seattle, WA, for amicus curiae American Civil Liberties Union.

III
The question of law to be answered is:

16
By using a racial tiebreaker to determine high school assignments, does Seattle School District Number 1 "discriminate against, or grant preferential treatment to, any individual or group on the basis of race, ... color, ethnicity, or national origin in the operation of ... public education" in violation of Initiative 200 (I-200), codified at Washington Revised Code § 49.60.400?

IV
The statement of facts is as follows:

17
Based on the parties' submissions, it appears that approximately 70% of the residents of Seattle, Washington are white, while approximately 30% are non-white. This racial diversity is reflected in Seattle's public schools, where the percentages are more evenly balanced: the students are approximately 40% white and 60% non-white.

18
The racial distribution of the community is not, however, homogeneous. It appears that more white students live in the northern part of Seattle, and in areas close to the waterfront in all parts of the city, than in the southern part of the city. Specifically, approximately 66% of white students live north of downtown. In contrast, approximately 77% of non-white students live south of downtown—including 84% of all African-American students, 74% of all Asian students, and 65% of all Hispanic students.

19
* Seattle School District Number 1 (the "School District"), which is charged with educating the children of this metropolis, operates ten public high schools: Ballard, Chief Sealth, Cleveland, Franklin, Garfield, Ingraham, Nathan Hale, Rainier Beach, Roosevelt, and West Seattle. Four of these high schools (Ballard, Ingraham, Nathan Hale, and Roosevelt) are located north of downtown Seattle; of the remaining six, five (Chief Sealth, Cleveland, Franklin, Garfield, and Rainier Beach) are located south of downtown, and one (West Seattle) is located directly west of downtown.

20
Seattle's public high schools vary widely in quality, as measured by such factors as standardized test scores, numbers of college preparatory and Advanced Placement (AP) courses offered, percentage of students taking AP courses and Scholastic Aptitude Tests (SATs), percentage of graduates who attend college, Seattle Times college-preparedness rankings, University of Washington rankings, and disciplinary statistics. Moreover, some of the schools offer programs or opportunities not offered in other schools.1

21
The School District has never been segregated by law ("de jure" segregated). However, due to Seattle's racial diversity and its racially imbalanced housing patterns, if Seattle's children were simply assigned to the high schools nearest their homes, the high schools would become segregated in fact ("de facto" segregated). As part of its continuing effort to prevent de facto segregation and to promote racial diversity in its high schools, instead of assigning students to the high schools nearest their homes, the School District has adopted an open choice assignment plan, pursuant to which each student may choose to attend any of the ten high schools in the city, so long is there is room available in that school.

22
In its current incarnation, the School District's open choice plan provides for a multi-step assignment process. Under the plan, each student is first asked to list the high schools he would like to attend, in order of preference. If a student is not admitted to his first-choice school because it is full, the School District attempts to assign him to his second-choice school, and so on. If a student is not admitted to any of his chosen schools, he receives a mandatory assignment to a school with available space.

23
Not surprisingly, under this system, a significant problem arises when a school becomes "oversubscribed"—i.e., more students want to attend that school than there are spaces. For the academic year 2000-01, five of the School District's high schools were oversubscribed, and five were undersubscribed.2 The magnitude of oversubscription underscores its problematic nature: for example, in the academic year 2000-01, approximately 82% of students selected one of the oversubscribed high schools as their first choice, while only about 18% picked one of the undersubscribed high schools as their first choice.

24
To solve the problem of oversubscription, the School District's assignment plan uses a series of four "tiebreakers" to determine which students will be admitted to each oversubscribed school.

25
* The first tiebreaker gives preference to students with siblings already attending the school requested. This tiebreaker accounts for somewhere between 15% and 20% of high school assignments.

2

26
If after applying the first tiebreaker a school is still oversubscribed, the School District next proceeds to a second tiebreaker, which is based entirely on race. For purposes of the racial tiebreaker, students are deemed to be of the race specified in their registration materials, which ask parents to specify the student's race using codes provided on a form. Because registration must be completed in person by a parent, if a parent declines to specify a racial category, the School District assigns the student a category based on a visual inspection of the parent (and the student, if present) at registration. It is this racial tiebreaker that spawned this lawsuit.

27
The School District uses the racial tie-breaker in an attempt to "balance" the racial makeup of the various Seattle public high schools. Accordingly, if an oversubscribed school's population deviates from the overall racial makeup of Seattle's students (40% white and 60% non-white) by more than a set number of percentage points, then the School District designates the school "integration positive."3 The racial tiebreaker is then applied when determining assignments to integration positive schools such that students whose race (i.e., white or non-white) will move the school closer to that ratio are given admission preference.4 As presently in force this tiebreaker has a "thermostat"; the School District ceases to use the racial tiebreaker for the year at any school once use of the tiebreaker has brought the school into racial balance. All told, the racial tiebreaker determines about 10% of high school assignments.

3

28
Once all students of the preferred racial category are admitted to an oversubscribed high school, any remaining seats are allocated using a third tiebreaker: distance. Applicants are admitted in order of the distance they live from the school, with those who live closest to the school admitted first.

4

29
A fourth tiebreaker, a lottery, is rarely used in high school assignments because distances are calculated to one hundredth of a mile for purposes of the third tiebreaker.

B

30
The Parents describe themselves as "a nonprofit corporation formed by parents whose children have been or may be denied admission to the high schools of their choosing solely because of race." The Parents put forward four members as "examples" of the effects of the racial tiebreaker.

31
First, the Parents point to members Jill Kurfurst and Winnie Bachwitz. Each has a child who entered high school in the 2000-01 school year and plans to attend college. After reviewing test statistics, course offerings, extracurricular programs, college rankings, disciplinary statistics, and proximity, the Kurfurst and Bachwitz children applied for admission to Ballard, Roosevelt, and Nathan Hale High Schools. They chose Ballard first, partly because of its unique Biotech Academy. However, both children, while accepted into the program, were denied admission to Ballard because of their race and consequently were not allowed to enroll. They were also denied admission to Nathan Hale because of their race. Both were assigned to Ingraham High School.

32
When assignments were announced for the 2000-01 school year, the School District apparently did not run school buses to Ingraham from the neighborhoods where Kurfurst and Bachwitz lived. Consequently, attendance at Ingraham would have required the children to take three Metro buses to get to school, resulting in a round-trip commute of over four hours. Both students hoped to participate in after-school activities; that would have required each of them to leave home at 5:30 a.m., return at 8:00 or 9:00 p.m., and on each trip to wait for three buses, often alone and in the dark. Little time would have remained for homework and family activities. These assignments being unacceptable to both families, they appealed, but without success. Ultimately, Kurfurst and Bachwitz decided to send their children to private schools.

33
Two other Parents, Rick Hack and John Miller, have children in Seattle public middle schools who expect to apply for high school admission for 2002-03, and will likely be affected by the racial tiebreaker.

C

34
The Parents commenced this legal action in July of 2000, challenging the School District's use of the racial tiebreaker for high school admissions as illegal under state and federal law. Specifically, the Parents alleged that by using race to decide who may attend the oversubscribed high schools, the School District discriminates and grants a preference on the basis of race—thereby violating the Washington Civil Rights Act, Wash. Rev.Code § 49.60.400 (passed in 1998 as Voter Initiative 200, or I-200). The Parents further alleged that the racial tiebreaker violates both the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and the Civil Rights Act of 1964, 42 U.S.C. § 2000d.5

35
The Parents and the School District both moved for summary judgment on all claims; neither contended that genuine issues of material fact precluded summary judgment. The court granted the School District's motion and denied the Parents' motion. In a published opinion dated April 6, 2001, the district court upheld the use of the racial tiebreaker under both state and federal law. See Parents Involved In Cmty. Schs. v. Seattle Sch. Dist. No. 1, 137 F.Supp.2d 1224 (W.D.Wash. 2001).

36
With respect to the state claim, the court emphasized its duty to "construe I 200, if possible, in a way that makes [that provision] consistent with the state and federal constitutions...." Id. at 1227. Because it read sections 1 and 2 of Article IX of the Washington Constitution as requiring school districts "to provide equal educational opportunity to students of all races, to limit racial isolation, and to provide a racially and ethnically diverse educational experience," id. at 1228, it reasoned that "applying I 200 to outlaw the school district's integration plan would render [it] unconstitutional," id. at 1227. It therefore interpreted the provision in such a way as to find it inapplicable to the School District's assignment plan. Id. at 1232.

37
The district court entered judgment for the School District in accordance with its opinion. This timely appeal followed.

V

38
We respectfully submit that the question presented in Part III requires certification for the following reasons:

39
The Parents contend, and the district court agreed, that "that nonwhite children given spots at Nathan Hale and Ballard, or white children given spots at Franklin, are being granted a `preference' in common parlance." Parents Involved, 137 F.Supp.2d at 1232. Nonetheless, the district court found that I 200 did not bar the district's use of the racial tiebreaker. It so concluded because, as the School District argued, "[t]he term `preference,' ... as used in the Washington Constitution and defined in state and federal law, and therefore necessarily as used in Initiative 200, has acquired a legally fixed meaning derived from dozens of years of race discrimination jurisprudence. Under that definition, the school board's program is not a preference." Id.6

40
As these competing arguments demonstrate, answering the question of state law presented in this case may well entail addressing several subsidiary issues that contain crucial elements of state law, for example:

41
• Should the term "preference" in I-200 be interpreted to have its ordinary lay meaning, in accordance with Washington cases holding that the average voter is the touchstone for the construction of an initiative, or are state law and/or federal law to be relevant in interpreting I-200? If state law is relevant, are California cases construing Proposition 209, the wording of which is identical to I 200, relevant?

42
• Is the meaning of I-200 clear, or is the text ambiguous, making consideration of voter's pamphlet material relevant? If it is pertinent to the analysis, what factors should be used to evaluate this material?

43
• Does article 9, section 1, of the Washington Constitution, or article 9, section 2, of the Washington Constitution, require that measures be taken to mitigate de facto segregation, or only permit it? In any event, is the Seattle School District's use of the racial tiebreaker required, permitted, or otherwise under the Washington Constitution and I-200?

44
Because of the sensitivity and complexity of these state-law issues, and because of their significant policy implications for Washington courts in other cases as well as in this one, we believe that the Washington Supreme Court, which has not yet construed I-200, is better qualified to answer the certified question in the first instance.

45
Moreover, the Washington Supreme Court's authoritative answer is "necessary.... in order to dispose of [this] proceeding." Wash. Rev.Code § 2.60.020. In addition to raising the state law claim under I 200, the Parents have also asserted that the School District's use of the racial tiebreaker violates the Fourteenth Amendment's Equal Protection Clause. Our precedents make clear, however, that we must "look first to state law to resolve this [case], in accordance with our long-standing principle that courts should avoid making federal constitutional decisions unless and until necessary." Clark v. City of Lakewood, 259 F.3d 996, 1016 n. 12 (9th Cir.2001). Thus, the state law question herein certified must be answered in order to dispose of this appeal.

VI

46
The Clerk of Court is hereby directed to transmit forthwith to the Washington Supreme Court, under official seal of the Ninth Circuit, a copy of this order and request for certification and all relevant briefs and excerpts of record pursuant to Washington Revised Code §§ 2.60.010 and 2.60.030.

47
IT IS SO ORDERED.

Notes:

*
The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation

1
For example, Ballard High School offers a unique "Biotech Academy." Ballard describes the Biotech program as "[a] specialized learning program that brings together science, mathematics, and language arts to prepare students for advanced study and a career in the bio-sciences."See Ballard Biotechnology Program Web Page <http://www.seattleschools.org/schools/ballard/biotech.htm> (visited May 31, 2002). In fact, the program has its own separate admissions procedure, with required prerequisite classes. Admission to the program does not, however, guarantee admission to Ballard— which is governed by the School District's open enrollment plan.

2
Oversubscription was not, it appears, tied to geographic location. The oversubscribed schools included three high schools north of downtown (Ballard, Nathan Hale, and Roosevelt) and two high schools south of downtown (Garfield and Franklin). The undersubscribed schools included one north of downtown (Ingraham), three south of downtown (Chief Sealth, Cleveland, and Rainier Beach), and one due west of downtown (West Seattle)

3
The acceptable deviation is presently set at 15% (meaning that a school can have as many as 55% white students, or as few as 25% white students, and still be racially "balanced")

4
At the present time, three of the five oversubscribed schools are integration positive: Franklin, Ballard, and Nathan Hale. Accordingly, only these three schools use the racial tiebreaker. Moreover, under the current version of the plan, the integration tiebreaker is only used in determining the makeup of entering Ninth grade classes; the tiebreaker is not applied to students wishing to enter a high school in the Tenth, Eleventh, or Twelfth grades (e.g., transfer students)

5
The School District actually revised its admissions plan during the pendency of the lawsuit in an effort to reduce the hardships it imposed on students. For example, under the former version of the plan, the "acceptable deviation" range used to determine whether a school is "integration positive" was 10%, rather than 15%, and the racial tiebreaker was applied to students applying for all grade levels rather than just to freshmen. Before the district court the Parents contended that both the original and revised plans violated both state and federal law

6
Apparently, the district court reached the same conclusion with respect to whether the program constitutes "discrimination," as it upheld the program against I-200