285 F.3d 1236
 PARENTS INVOLVED IN COMMUNITY SCHOOLS, a Washington non-profit corporation, Plaintiff-counter-defendant-Appellant,
v.
SEATTLE SCHOOL DISTRICT, NO. 1, a political subdivision of the State of Washington; Joseph Olchefske, in his official capacity as superintendent; Barbara Schaadlamphere, in her official capacity as President of the Board of Directors of Seattle Public Schools; Donald Neilson, in his official
capacity as Vice President of the Board of Directors of Seattle Public Schools; Steven Brown; Jan Kumasaka; Michael Preston; Nancy Waldman, in their official capacities as members of the board of Directors, Defendants-counter-claimants-Appellees.
 No. 01-35450.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 4, 2001.
 Filed April 16, 2002.
 Order Granting Injunction April 26, 2002.
 
 Daniel B. Ritter (argued) & Harry J.F. Korrell (argued), Davis Wright Tremaine, LLP, Seattle, WA, for the plaintiff-counter-defendant-appellant.
 Michael Madden (argued) & Carol Sue Janes, Bennett, Bigelow & Leedom, P.S., Seattle, WA; Mark S. Green, Office of the General Counsel, Seattle School District No. 1, Seattle, WA, for the defendants-counter-claimants-appellees.
 Sharon L. Browne, Pacific Legal Foundation, Sacramento, CA; Russell C. Brooks, Pacific Legal Foundation, Bellevue, WA, for amici curiae American Civil Rights Institute, American Civil Rights Union, Center for Equal Opportunity, and Pacific Legal Foundation.
 Paul J. Lawrence, Preston, Gates & Ellis LLP, Seattle, WA, for amicus curiae American Civil Liberties Union.
 Appeal from the United States District Court for the Western District of Washington; Barbara J. Rothstein, Chief District Judge, Presiding. D.C. No. CV-00-01205-BJR.
 Before: REAVLEY*, O'SCANNLAIN, and GRABER, Circuit Judges.
 Opinion by Judge O'SCANNLAIN; Concurrence by Judge GRABER.
 O'SCANNLAIN, Circuit Judge.
 
 
 1
 We are asked to decide the legality of the use of race in determining which students will be admitted to oversubscribed high schools in Seattle, Washington.
 
 
 2
 * Seattle, Washington is a vibrant and racially diverse metropolis in the Pacific Northwest. Based on the parties' submissions, it appears that approximately 70% of the residents of Seattle, Washington are white, while approximately 30% are nonwhite. This racial diversity is reflected in Seattle's public schools, where the percentages are more evenly balanced: the students are approximately 40% white and 60% non-white.
 
 
 3
 The racial distribution of the community is not, however, homogeneous. It appears that more white students live in the northern part of Seattle, and in areas close to the waterfront in all parts of the city, than in the southern part of the city. Specifically, approximately 66% of white students live north of downtown. In contrast, approximately 77% of non-white students live south of downtown—including 84% of all African-American students, 74% of all Asian students, and 65% of all Hispanic students.
 
 
 4
 * Seattle School District Number 1 (the "School District"), which is charged with educating the children of this metropolis, operates ten public high schools: Ballard, Chief Sealth, Cleveland, Franklin, Garfield, Ingraham, Nathan Hale, Rainier Beach, Roosevelt, and West Seattle. Four of these High schools (Ballard, Ingraham, Nathan Hale, and Roosevelt) are located north of downtown Seattle; of the remaining six, five (Chief Sealth, Cleveland, Franklin, Garfield, and Rainier Beach) are located south of downtown, and one (West Seattle) is located directly west of downtown.
 
 
 5
 Seattle's public high schools vary widely in quality, as measured by such factors as standardized test scores, numbers of college preparatory and Advanced Placement (AP) courses offered, percentage of students taking AP courses and Scholastic Aptitude Tests (SATs), percentage of graduates who attend college, Seattle Times college-preparedness rankings, University of Washington rankings, and disciplinary statistics. Moreover, some of the schools offer programs or opportunities not offered in other schools.[1]
 
 
 6
 The School District has never been segregated by law ("de jure" segregated). However, due to Seattle's racial diversity and its racially imbalanced housing patterns, if Seattle's children were simply assigned to the high schools nearest their homes, the high schools would become segregated in fact ("de facto" segregated). As part of its continuing effort to prevent de facto segregation and to promote racial diversity in its high schools, instead of assigning students to the high schools nearest their homes, the School District has adopted an open choice assignment plan, pursuant to which each student may choose to attend any of the ten high schools in the city, so long is there is room available in that school.
 
 
 7
 In its current incarnation, the School District's open choice plan provides for a multi-step assignment process. Under the plan, each student is first asked to list the high schools he would like to attend, in order of preference. If a student is not admitted to his first-choice school because it is full, the School District attempts to assign him to his second-choice school, and so on. If a student is not admitted to any of his chosen schools, he receives a mandatory assignment to a school with available space.
 
 
 8
 Not surprisingly, under this system, a significant problem arises when a school becomes "oversubscribed" — i.e., more students want to attend that school than there are spaces. For the academic year 2000-01, five of the School District's high schools were oversubscribed, and five were undersubscribed.[2] The magnitude of oversubscription underscores its problematic nature: for example, in the academic year 2000-01, approximately 82% of students selected one of the oversubscribed high schools as their first choice, while only about 18% picked one of the undersubscribed high schools as their first choice.
 
 
 9
 To solve the problem of oversubscription, the School District's assignment plan uses a series of four "tiebreakers" to determine which students will be admitted to each oversubscribed school.
 
 
 10
 * The first tiebreaker gives preference to students with siblings already attending the school requested. This tiebreaker accounts for somewhere between 15% and 20% of high school assignments.
 
 2
 
 11
 If after applying the first tiebreaker a school is still oversubscribed, the School District next proceeds to a second tiebreaker, which is based entirely on race. For purposes of the racial tiebreaker, students are deemed to be of the race specified in their registration materials, which ask parents to specify the student's race using codes provided on a form. Because registration must be completed in person by a parent, if a parent declines to specify a racial category, the School District assigns the student a category based on a visual inspection of the parent (and the student, if present) at registration. It is this racial tiebreaker that spawned this lawsuit.
 
 
 12
 The School District uses the racial tiebreaker in an attempt to "balance" the racial makeup of the various Seattle public high schools. Accordingly, if an oversubscribed school's population deviates from the overall racial makeup of Seattle's students (40% white and 60% non-white) by more than a set number of percentage points, then the School District designates the school "integration positive."[3] The racial tiebreaker is then applied when determining assignments to integration positive schools such that students whose race (i.e., white or non-white) will move the school closer to that ratio are given admission preference.[4] As presently in force this tiebreaker has a "thermostat"; the School District ceases to use the racial tiebreaker for the year at any school once use of the tiebreaker has brought the school into racial balance. All told, the racial tiebreaker determines about 10% of high school assignments.
 
 3
 
 13
 Once all students of the preferred racial category are admitted to an oversubscribed high school, any remaining seats are allocated using a third tiebreaker: distance. Applicants are admitted in order of the distance they live from the school, with those who live closest to the school admitted first.
 
 4
 
 14
 A fourth tiebreaker, a lottery, is rarely used in high school assignments because distances are calculated to one hundredth of a mile for purposes of the third tiebreaker.
 
 B
 
 15
 Parents Involved in Community Schools (the "Parents") describe themselves as "a nonprofit corporation formed by parents whose children have been or may be denied admission to the high schools of their choosing solely because of race." The Parents put forward four members as "examples" of the effects of the racial tiebreaker.
 
 
 16
 First, the Parents point to members Jill Kurfurst and Winnie Bachwitz. Each has a child who entered high school in the 2000-01 school year and plans to attend college. After reviewing test statistics, course offerings, extracurricular programs, college rankings, disciplinary statistics, and proximity, the Kurfurst and Bachwitz children applied for admission to Ballard, Roosevelt, and Nathan Hale High Schools. They chose Ballard first, partly because of its unique Biotech Academy. However, both children, while accepted into the program, were denied admission to Ballard because of their race and consequently were not allowed to enroll. They were also denied admission to Nathan Hale because of their race. Both were assigned to Ingraham High School.
 
 
 17
 When assignments were announced for the 2000-01 school year, the School District apparently did not run school buses to Ingraham from the neighborhoods where Kurfurst and Bachwitz lived. Consequently, attendance at Ingraham would have required the children to take three Metro buses to get to school, resulting in a round-trip commute of over four hours. Both students hoped to participate in after-school activities; that would have required each of them to leave home at 5:30 a.m., return at 8:00 or 9:00 p.m., and on each trip to wait for three buses, often alone and in the dark. Little time would have remained for homework and family activities. These assignments being unacceptable to both families, they appealed, but without success. Ultimately, Kurfurst and Bachwitz decided to send their children to private schools.
 
 
 18
 Two other Parents, Rick Hack and John Miller, have children in Seattle public middle schools who expect to apply for high school admission for 2002-03, and will likely be affected by the racial tiebreaker.
 
 C
 
 19
 The Parents commenced this legal action in July of 2000, challenging the School District's use of the racial tiebreaker for high school admissions as illegal under state and federal law. Specifically, the Parents alleged that by using race to decide who may attend the oversubscribed high schools, the School District discriminates and grants a preference on the basis of race — thereby violating the Washington Civil Rights Act, Wash. Rev.Code § 49.60.400 (passed in 1998 as Voter Initiative 200, or I-200).[5] The Parents further alleged that the racial tiebreaker violates both the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and the Civil Rights Act of 1964, 42 U.S.C. § 2000d.[6]
 
 
 20
 The Parents and the School District both moved for summary judgment on all claims; neither contended that genuine issues of material fact precluded summary judgment. The court granted the School District's motion and denied the Parents' motion. In a published opinion dated April 6, 2001, the district court upheld the use of the racial tiebreaker under both state and federal law. See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 137 F.Supp.2d 1224 (W.D.Wash.2001).
 
 
 21
 With respect to the state claim, the court emphasized its duty to "construe [section 49.60.400], if possible, in a way that makes [that provision] consistent with the state and federal constitutions...." Id. at 1227. Because it read sections 1 and 2 of Article IX of the Washington Constitution as requiring school districts "to provide equal educational opportunity to students of all races, to limit racial isolation, and to provide a racially and ethnically diverse educational experience," id. at 1228, it reasoned that "applying [section 49.60.400] to outlaw the school district's integration plan would render [it] unconstitutional," id. at 1227. It therefore interpreted the provision in such a way as to find it inapplicable to the School District's assignment plan. Id. at 1232.
 
 
 22
 With regard to the federal claims, the district court analyzed the admissions plan using strict scrutiny. Id. at 1232-40. It found that "[a]chieving racial diversity and mitigating the effects of de facto residential segregation are ... compelling government interests as a matter of law," id. at 1235, and that the School District's assignment plan "is narrowly tailored to further the compelling interests asserted in this case," id. at 1239.
 
 
 23
 The district court entered judgment for the School District in accordance with its opinion. This timely appeal followed.
 
 II
 
 24
 On appeal, the Parents contend first that the School District's use of the racial tiebreaker violates section 49.60.400 of the Washington Revised Code. That law provides that "[t]he state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." Wash. Rev.Code § 49.60.400(1). Section 49.60.400 applies to the School District. See id. 49.60.400(7) ("For the purposes of this section, `state' includes, but is not necessarily limited to,... school district[s] ... within the state.").
 
 
 25
 Because the courts of Washington have not yet construed this provision, we must, in our constitutionally ordained role as oracles of Washington law, construe the provision as we believe that the Supreme Court of Washington would.[7] See NLRB v. Calkins, 187 F.3d 1080, 1089 (9th Cir.1999) (explaining that where state's highest court has not addressed an issue of state law, a federal court's task is to "predict how the highest state court would decide the issue"). Thus, we must conduct our analysis guided by the same principles that the Washington Supreme Court would apply to interpret this voter initiative.
 
 
 26
 In determining the proper construction of a ballot initiative like I-200, the Washington Supreme Court applies general rules of statutory construction. See Hi-Starr, Inc. v. Washington State Liquor Control Bd., 106 Wash.2d 455, 722 P.2d 808, 812 (1986) ("The rules of statutory construction apply to initiatives as well as to legislative enactments."). Thus, "where the language of the enactment is plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation." W. Petroleum Imps., Inc. v. Friedt, 127 Wash.2d 420, 899 P.2d 792, 795 (1995).
 
 
 27
 The parties debate the meaning to be gleaned from various aspects of the legislative history surrounding the adoption of section 49.60.400. We need not reach that step in the analysis, however, because under Washington law the court ends its inquiry with the text of an initiative when the text is clear. See, e.g., Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 11 P.3d 762, 780 (2001) ("Where the language of an initiative enactment is plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation."); Senate Republican Campaign Comm. v. Pub. Disclosure Comm'n, 133 Wash.2d 229, 943 P.2d 1358, 1365 (1997) (holding that the court was "not required to glean the intent of the people from sources other than these statutes" because the meaning of the statutory terms was clear); City of Tacoma v. State, 117 Wash.2d 348, 816 P.2d 7, 11 (1991) ("Because the intent of the people is clearly expressed in the statute, we do not need to look to the [voters'] pamphlet.").
 
 
 28
 Finally, while generally the same as the interpretation of legislatively enacted statutes, the interpretation of voter initiatives is unique in one crucial way: "[i]n construing the meaning of an initiative, the language of the enactment is to be read as the average informed lay voter would read it."[8] Friedt, 899 P.2d at 795 (emphasis added).
 
 
 29
 * The plain meaning of section 49.60.400 seems remarkably clear when it is applied to the School District's use of the racial tiebreaker. The provision unambiguously states that the School District "shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race ... in the operation of ... public education...." Wash. Rev.Code § 49.60.400(1) (emphasis added). We believe that an average lay voter would understand "preferential" treatment as "[o]f, relating to, or giving advantage or preference," The American Heritage Dictionary of the English Language, Online Edition (4th ed.2000) <http://www.bartleby.com/61/0/P0520000.html> (visited Mar. 6, 2002), and "preference," in turn, as "[t]he selecting of someone or something over another or others," id. <http://www.bartleby.com/61/0/P0520000.html> (visited Mar. 6, 2002). When applied to a zero-sum situation such as that involved in the present case, where only a certain number of individuals can be admitted to a given high school, the racial tiebreaker grants an advantage or preference on the basis of race: members of one group are selected for admission, while members of another are not, solely on the basis of race.
 
 
 30
 Under this plain meaning reading of the language, it is clear that section 49.60.400 prohibits the School District's use of the racial tiebreaker. The tiebreaker operates such that at one stage in the process of determining which students may attend oversubscribed high schools, the race of the students is determinative. If an oversubscribed school is "racially imbalanced" (i.e., there are "too many" white or nonwhite students there as the School District has defined that term, meaning within some acceptable range of deviation from a 60% non-white to 40% white ratio), students whose race will bring the school into balance are admitted, while other students are not. At Ballard, for instance, nonwhites are admitted preferentially because they are not white; and at Franklin, whites are admitted preferentially because they are white. There is no question, then, that the tiebreaker selects some students over others based on their race. See also Wessmann v. Gittens, 160 F.3d 790, 794 (1st Cir.1998) (concluding that admissions policy "grant[ed] [a] preference[]" based on race where, "[a]t a certain point in its application process ... the Policy relies on race and ethnicity, and nothing else, to select a subset of entrants"). Thus, because the tiebreaker "grant[s] preferential treatment to" some students, applying to an oversubscribed Seattle public high school "on the basis of race," the tiebreaker runs afoul of the plain meaning of section 49.60.400(1).[9]
 
 B
 
 31
 The district court's opinion is in substantial agreement with the foregoing analysis of the meaning of section 49.60.400. Indeed, the court recognized that "[i]t may be said ... that nonwhite children given spots at Nathan Hale and Ballard, or white children given spots at Franklin, are being granted a `preference' in common parlance." Parents Involved, 137 F.Supp.2d at 1232.[10] Apparently, however, the district court was concerned that if section 49.60.400 barred the School District from using the racial tiebreaker, it might run afoul of the Washington Constitution Consequently, the court adopted a "saving construction" of the statute that upheld the School District's assignment plan. See id. at 1227.[11] The court then attempted to buttress the reading that this method produced by looking to federal cases.
 
 
 32
 As demonstrated below, however, such an exercise was unnecessary. Nothing in Washington law or federal law would nullify section 49.60.400(1) if the provision bars the School District from using its racial tiebreaker. Moreover, contrary to the district court's approach, federal law actually supports — rather than undermines — the construction of "preferential treatment" that results from the foregoing plain meaning analysis.
 
 
 33
 * The district court began by examining two sections of the Washington Constitution. The first, the preamble to the article of the Washington Constitution that deals with education, explains that "[i]t is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." Wash. Const. art. IX § 1. The succeeding section states that "[t]he legislature shall provide for a general and uniform system of public schools." Wash. Const. art. IX § 2.
 
 
 34
 The district court correctly observed that several decisions of the Washington Supreme Court teach that the Washington Constitution gives school districts the authority to use race-based classifications to achieve racial diversity (or, to put it differently, to remedy de facto segregation).[12] In State ex rel. Citizens Against Mandatory Bussing v. Brooks, 80 Wash.2d 121, 492 P.2d 536 (1972), for example, the Washington Supreme Court affirmed a trial court's decision thwarting a recall of several board members based on their planned implementation of a busing plan to remedy de facto segregation. The Court relied upon Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) for the proposition that
 
 
 35
 [s]chool authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude ... that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities.
 
 
 36
 Brooks, 492 P.2d at 541 (quoting Swann, 402 U.S. at 16, 91 S.Ct. 1267). Given this language in Swann, the court concluded that "if the Constitution supports court directed mandatory busing to desegregate schools in a system which is dual `de jure,' then such bussing [sic] is within the appropriate exercise of the discretion of school authorities in a system which is dual `de facto.'" Brooks, 492 P.2d at 541. It therefore found the proposed busing plan within the discretion of the board members and, consequently, declined to allow the plaintiffs to commence a recall of those officials for malfeasance or the like. Id. at 541-42. Brooks thus stands for the proposition that the use of race-based classifications to achieve racial diversity is, under Washington's constitution, "within the appropriate exercise of the discretion of school authorities in a system which is dual `de facto.'" Id. at 541. That is, it is permissible under the Washington Constitution. See also Citizens Against Mandatory Bussing v. Palmason, 80 Wash.2d 445, 495 P.2d 657, 659 (1972) (explaining that Brooks held that implementation of the plan "for the desegregation of schools within the district" was "within the lawful exercise of the discretion lodged in that board by statute").
 
 
 37
 Similarly in Palmason, a follow-up case to Brooks, the Washington Supreme Court upheld the authority of a school district to implement a mandatory busing plan to remedy de facto segregation in Seattle's public schools. The plaintiffs did not seriously dispute that the board had the authority to implement the plan; the trial court did not question this authority, either. Id. at 660. And while the plaintiffs asserted various "fundamental rights" that they thought abrogated the authority of the board to implement the plan, the Supreme Court was not persuaded. Absent some abrogation of its authority the board was free, the court explained, to implement its busing policy: "[I]t was the duty of the school board to act in the best interests of the majority of students; and the fact that some students might suffer adverse effects was not a consideration which, in law, they were required to find controlling." Id. at 665.
 
 
 38
 The Court made clear, however, that the school district was not required to end de facto segregation. Rather, achieving racial diversity was "a sound policy of the school system." Id. at 666; see also id. ("[T]he adoption of the method of desegregation under attack here was a proper exercise of the board's discretionary powers.") (emphasis added). Because the plaintiffs could not show that the plan was "unauthorized by law," id., the directors had discretion to implement it:
 
 
 39
 In seeking to achieve ... those purposes which the people of this state have embodied in their constitution and statutes affecting education, school district directors must necessarily make value judgments. Here they were faced with the problem of weighing those benefits which can be derived from adhering to the neighborhood school concept against those which can be expected to result from an integrated school system.... Faced with this dilemma, the defendant school directors concluded that their duty of providing for all children an equal opportunity for a sound education could most effectively be performed by adopting such a modification of the existing system.
 
 
 40
 Id. at 666-67.
 
 
 41
 After citing and analyzing these decisions, the district court concluded (and the School District argues on appeal) that because the Washington Constitution grants authority "to provide ... racially integrated schools, ... [a]n initiative effecting an amendment to this authority would be unconstitutional under Washington law." Parents Involved, 137 F.Supp.2d at 1229. Accordingly, the district court reasoned that if section 49.60.400 bars the School District from using the racial tiebreaker, then that statute violates the Washington Constitution. As the above analysis makes clear, however, the district court's reasoning is flawed; nothing in the Washington Constitution requires the School District to provide racially diverse schools. As the decisions point out, the Washington Constitution merely provides school districts with the authority to adopt programs designed to achieve racial diversity in their schools. The constitutional provisions are, in this respect, permissive; they are not mandatory. Moreover, school districts may not exercise this permissively granted authority in any way "unauthorized by law."
 
 
 42
 In this case, unlike in any of the cases discussed, there is, in fact, a recently passed law — Washington Revised Code section 49.60.400 — which prevents the School District from implementing its racial tiebreaker to achieve its goal of racially diverse schools. Because the constitutional provisions only permit the School District to achieve racial diversity using race-based measures, and do not require it to do so, then, this law does not violate the Washington Constitution. Cf. Coalition for Econ. Equity v. Wilson, 122 F.3d 692, 708 (9th Cir.1997) ("That the [U.S.] Constitution permits the rare race-based or gender-based preference hardly implies that the state cannot ban them altogether."). Rather, under Washington precedents, section 49.60.400 permissibly circumscribes the School District's authority to effectuate its constitutionally imposed mission to educate Washington's students.[13]
 
 2
 
 43
 The district court also made extensive use of federal law in construing the meaning of section 49.60.400.[14] It relied principally on our decision in Coalition for Economic Equity v. Wilson. In Coalition, we examined the validity of California's Proposition 209 — a provision that, in all relevant respects, was identical to Initiative 200.[15] We held that (1) Prop. 209 did not restructure the political process in a way impermissible under Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) and Washington v. Seattle School District No. 1, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), and (2) even if it did restructure the political process, it was not unconstitutional because it did not burden any individual's right to equal treatment. See Coalition, 122 F.3d at 706-07. In making the second of these points, we explained that Prop. 209 would not bar a voluntary school desegregation effort like the mandatory busing program discussed in Seattle because, under our precedent, such desegregation was a "deck shuffle" rather than a "stacked deck" program. See id. at 707 n. 16 (citing Associated Gen. Contractors of Cal. v. S.F. Unif. Sch. Dist., 616 F.2d 1381, 1387 (9th Cir.1980)).
 
 
 44
 In this case, the district court focused on this second point of Coalition. Reading Coalition at the highest level of generality, it reasoned that the Coalition opinion upheld the constitutionality of Prop. 209 only because it did not bar voluntary school desegregation. See Parents Involved, 137 F.Supp.2d at 1231 (describing the opinion's distinction between "stacked deck" and "deck shuffle" programs as "critical to the case's holding"). Accordingly, the district court read Coalition as supporting the broad proposition that "[section 49.60.400] does not apply to programs designed to overcome racially imbalanced schools." Parents Involved, 137 F.Supp.2d at 1230.
 
 
 45
 We do not think that the language of Coalition fairly supports this reading. In Coalition, we concluded only that Prop. 209 did not invalidate voluntary desegregation programs of the type at issue in Seattle; we did not say that Prop. 209 would never invalidate a voluntary school desegregation program, no matter what it looked like. Accordingly, we were careful to point out that the busing program at issue in Seattle was "not inherently invidious, d[id] not work wholly to the benefit of certain members of one group and correspondingly to the harm of certain members of another group, and d[id] not deprive citizens of rights." Coalition, 122 F.3d at 707 n. 16.
 
 
 46
 The School District's racial tiebreaker, on the other hand, while perhaps similar in its objective, works in a way that differs crucially from the voluntary desegregation plan at issue in Seattle. As the U.S. Supreme Court explained, the plan at issue in Seattle
 
 
 47
 ma[de] extensive use of busing and mandatory reassignments, desegregate[d] elementary schools by "pairing" and "triading" predominantly minority with predominantly white attendance areas, and by basing student assignments on attendance zones rather than on race. The racial makeup of secondary schools is moderated by "feeding" them from the desegregated elementary schools. The District represents that the plan results in the reassignment of roughly equal numbers of white and minority students, and allows most students to spend roughly half of their academic careers attending a school near their homes.
 
 
 48
 Seattle, 458 U.S. at 461, 102 S.Ct. 3187 (emphasis added) (record citation omitted). Contrast the plan in Seattle, which made no decisions based on race alone, with the racial tiebreaker at issue in this case, under which during one stage of the admissions process all decisions are made based solely on race. The racial tiebreaker at issue in this case, then, unlike the plan at issue in Seattle, is "inherently invidious." The conclusion that section 49.60.400 applies to the School District's use of the racial tiebreaker — and, in fact, renders it illegal — is, thus, entirely consistent with our decision in Coalition.
 
 3
 
 49
 Curiously, in discussing federal law for support of its construction of section 49.60.400, the district court failed to mention the seminal Supreme Court case dealing with racial classifications in the context of educational admissions, Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (plurality opinion). We recently reaffirmed that, in this Circuit, Justice Powell's opinion in Bakke remains controlling law. See Smith v. University of Wash. Law Sch., 233 F.3d 1188, 1201 (9th Cir.2000), cert. denied, 532 U.S. 1051, 121 S.Ct. 2192, 149 L.Ed.2d 1024 (2001). And that opinion supports, rather than undermines, the conclusion that the plain meaning reading of section 49.60.400 is the correct reading.[16]
 
 
 50
 Bakke, of course, dealt with the admissions program used by the University of California at Davis's Medical School. Under that program, a certain number of seats in each entering class was reserved for minority (i.e., non-white) students. Bakke, 438 U.S. at 274, 98 S.Ct. 2733. Bakke, a white male who was denied admission to the Medical School, brought suit claiming that the admissions program violated, inter alia, Title VI and the Equal Protection Clause. Id. at 278-79, 98 S.Ct. 2733.
 
 
 51
 Justice Powell wrote a plurality opinion for a splintered Court. He concluded that the program, which granted a "preference" to racial minorities, id. at 298, 98 S.Ct. 2733, was
 
 
 52
 undeniably a classification based on race and ethnic background. To the extent that there existed a pool of at least minimally qualified minority applicants to fill the [reserved] seats, white applicants could compete only for [the remaining] seats in the entering class, rather than the [total number of seats] open to minority applicants. Whether this limitation is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status.
 
 
 53
 Id. at 289, 98 S.Ct. 2733. He found this preference no less problematic because it worked to the benefit of minorities; as he explained, "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal." Id. at 289-90, 98 S.Ct. 2733; see also id. at 293, 98 S.Ct. 2733 ("Although many of the Framers of the Fourteenth Amendment conceived of its primary function as bridging the vast distance between members of the Negro race and the white `majority,' ... the Amendment itself was framed in universal terms, without reference to color, ethnic origin, or condition of prior servitude.") (citation omitted). Accordingly, he explained, "[o]ver the years, this Court has consistently repudiated [d]istinctions between citizens solely because of their ancestry as being odious to a free people whose institutions are founded upon the doctrine of equality." Id. at 294, 98 S.Ct. 2733 (internal quotation marks omitted). Indeed, Justice Powell seemed especially disturbed by the idea that the admissions program conceived of the world under a "two-class theory — that is, based upon differences between white and Negro." Id. at 295, 98 S.Ct. 2733 (internal quotation marks omitted). He found this approach problematic because "the white `majority'" is itself "composed of various minority groups, most of which can lay claim to a history of prior discrimination at the hands of the State and private individuals." Id.
 
 
 54
 With these principles in mind, Justice Powell declared that if the purpose of the Medical School's admissions program was "to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid." Id. at 307. "Preferring members of any one group for no reason other than race or ethnic origin," he concluded, "is discrimination for its own sake." Id.
 
 
 55
 Like the admissions program at issue in Bakke, the School District's use of the racial tiebreaker effectively divides the universe of Seattle public high school students into two categories: white and nonwhite. At integration-positive schools, it then forecloses students whose race represents a "majority" at the school from consideration from a fixed number of seats.[17] Such a racial classification, under which students are admitted based solely on the color of their skin, is materially indistinguishable from the classification at issue in Bakke. It is clearly a preference. Cf. City of Richmond v. J.A. Croson Co., 488 U.S. 469, 524, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (Scalia, J., concurring) ("[I]t is implicit in our cases that after the dual [de jure] school system has been completely disestablished, the States may no longer assign students by race."). Thus, federal authority actually lends support to the notion that the racial tiebreaker constitutes a preference, and consequentially, that it violates Washington law.
 
 C
 
 56
 We conclude, therefore, that the School District's use of the racial tiebreaker violates Washington law. Because "we look first to state law to resolve this issue, in accordance with our longstanding principle that courts should avoid making federal constitutional decisions unless and until necessary," Clark v. City of Lakewood, 259 F.3d 996, 1016 n. 12 (9th Cir.2001), we need not decide whether it may also offend the Fourteenth Amendment's Equal Protection Clause, or the Civil Rights Act of 1964, 42 U.S.C. § 2000d.
 
 III
 
 57
 The School District seeks to ensure racial diversity in each of its high schools, so that each School District student can obtain the benefits of attending a racially and ethnically diverse school. While this may well be a reasonable policy choice by the School District, the citizens of Washington have made a policy choice of their own. Washingtonians have collectively decided that, even though racial diversity may well benefit the School District's public school students, the price of that diversity — that some students are told that they may not attend their high school of choice simply because their skin is the wrong color — is too high. Accordingly, the citizens have concluded that whatever its benefits, racial diversity should not be achieved by a process that allows the government to "discriminate against, or grant preferential treatment to, any individual or group on the basis of race, ... color, ethnicity, or national origin...." Wash. Rev.Code § 49.60.400(1).
 
 
 58
 As federal judges, we are not charged with the arduous task of choosing between these competing policy choices on their merits. Indeed, "how we judges might weigh competing policy considerations is simply irrelevant." Rucker v. Davis, 203 F.3d 627, 639 (9th Cir.2000), rev'd en banc, 237 F.3d 1113 (9th Cir.2001), rev'd sub nom. Dep't of Hous. and Urban Dev. v. Rucker, ___ U.S. ___, 122 S.Ct. 1230, ___ L.Ed.2d ___ (2001). Instead, our proper role is a limited one; we do not decide which choice is "better," but only whose choice controls. We conclude that, in this case, the will of the School District must give way to the will of the people of Washington.
 
 
 59
 Under the plain meaning of section 49.60.400, as the Washington Supreme Court would interpret it, the racial tiebreaker constitutes preferential treatment of some students over others on the basis of race. Nothing in the Washington Constitution or federal law requires a different reading; indeed, Supreme Court jurisprudence on racial preferences in educational admissions is entirely consistent with this conclusion.
 
 
 60
 Accordingly, the decision of the district court must be REVERSED.
 
 
 
 Notes:
 
 
 *
 The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 For example, Ballard High School offers a unique "Biotech Academy." Ballard describes the Biotech program as "[a] specialized learning program that brings together science, mathematics, and language arts to prepare students for advanced study and a career in the biosciences."See Ballard Bio-technology Program Web Page <http://www.seattleschools.org/schools/ballard/biotech.html> (visited Mar. 6, 2002). In fact, the program has its own separate admissions procedure, with required prerequisite classes. Admission to the program does not, however, guarantee admission to Ballard — which is governed by the School District's open enrollment plan.
 
 
 [2]
 Oversubscription was not, it appears, tied to geographic location. The oversubscribed schools included three high schools north of downtown (Ballard, Nathan Hale, and Roosevelt) and two high schools south of downtown (Garfield and Franklin). The undersubscribed schools included one north of downtown (Ingraham), three south of downtown (Chief Sealth, Cleveland, and Rainier Beach), and one due west of downtown (West Seattle)
 
 
 [3]
 The acceptable deviation is presently set at 15% (meaning that a school can have as many as 55% white students, or as few as 25% white students, and still be racially "balanced")
 
 
 [4]
 At the present time, three of the five oversubscribed schools are integration positive: Franklin, Ballard, and Nathan Hale. Accordingly, only these three schools use the racial tiebreaker. Moreover, under the current version of the plan, the integration tiebreaker is only used in determining the makeup of entering Ninth grade classes; the tiebreaker is not applied to students wishing to enter a high school in the Tenth, Eleventh, or Twelfth grades (e.g., transfer students)
 
 
 [5]
 The voter initiative is a species of legislative power reserved to the people of Washington under the Washington Constitution. When a voter initiative receives a majority of votes in a general election, it shares the status of an act passed by the legislatureSee Wash. Const. art. II, § 1(a) ("The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the state of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature....").
 Like legislatively enacted laws, voter initiatives are subordinate to the Washington Constitution. See Gerberding v. Munro, 134 Wash.2d 188, 949 P.2d 1366, 1370 (1998) ("[T]he people in their legislative capacity remain subject to the mandates of the Constitution."). Thus, like legislative enactments, voter initiatives cannot amend the Washington Constitution. See id. at 1377 n. 11 ("[T]he initiative power may not be used to amend the Constitution.").
 
 
 [6]
 The School District actually revised its admissions plan during the pendency of the lawsuit in an effort to reduce the hardships it imposed on students. For example, under the former version of the plan, the "acceptable deviation" range used to determine whether a school is "integration positive" was 10%, rather than 15%, and the racial tiebreaker was applied to students applying for all grade levels rather than just to freshmen. Before the district court the Parents contended that both the original and revised plans violated both state and federal law
 
 
 [7]
 Neither party has suggested that we certify a question to the Washington Supreme Court. Indeed, in response to questions from the bench during oral argument, both parties urged us not to do so. Because we believe that the answer under Washington law is clear, we have not exercised our discretion to certify a questionSee generally Broad v. Mannesmann Anlagenbau AG, 196 F.3d 1075 (9th Cir.1999); Wash. Rev.Code § 2.60.020.
 
 
 [8]
 This approach contrasts with the approach to be used when interpreting a statute passed by the legislature. When interpreting a statute, if it uses a term having an established legal meaning, Washington courts presume that the statutory term was intended to have that meaningSee, e.g., Cowles Publ'g Co. v. State Patrol, 109 Wash.2d 712, 748 P.2d 597, 602 (1988) ("Inasmuch as the statute contains no definition of the term, there is a presumption that the legislature intended the right of privacy to mean what it meant at common law.").
 
 
 [9]
 Under this approach, the School District's use of the racial tiebreaker may well also constitute "discriminat[ion] against" students on the basis of race. "[D]iscriminat[ion]" means something like, "[t]o make distinctions on the basis of class or category without regard to individual merit; show preference or prejudice: was accused of discriminating against women; discriminated in favor of his cronies." The American Heritage Dictionary of the English Language, Online Edition (4th ed.2000) <http://www.bartle-by.com/61/30/D0263000.html> (visited Mar. 6, 2002). We are mindful of the canon of statutory construction that teaches that "courts do not construe different terms within a statute to embody the same meaning." Sutherland Statutory Construction § 46.06, at 193-94 (6th ed.2000). But we do not understand that canon to mean that there cannot be overlap between words in a statute, such that in some cases, both applySee, e.g., United States v. Hill, 79 F.3d 1477, 1482-83 (6th Cir.1996) (construing two terms joined by disjunctive "or"; recognizing that "[i]t is a basic principle of statutory construction that terms joined by the disjunctive `or' must have different meanings because otherwise the statute or provision would be redundant" but observing, "[n]onetheless, ... that there is considerable overlap between the two terms"). Because the School District's use of the tiebreaker clearly involves granting a race-based preference, however, we ultimately need not decide whether it also constitutes race-based discrimination.
 
 
 [10]
 The district court may not have agreed entirely, though, with the conclusion that as a matter of pure semantics section 49,60,400 invalidates the School District's use of the racial tiebreaker. Despite the foregoing passage, the district court nonetheless was persuaded by this argument in concluding that the racial tiebreaker is not a preference:
 [A] constitutionally — infirm contract procurement or university admissions policy grants preference only to nonwhites. The program at issue here falls indiscriminately on whites and nonwhites alike, ensuring a racially integrated system for the benefit of the school district as a whole. Even while the program allows minority students access to Ballard and Hale, Seattle's popular predominantly white schools, it also allows white students access to Franklin, the city's popular predominantly minority school. It is in this sense, too, that the program is not a "preference."
 Parents Involved, 137 F.Supp.2d at 1231.
 Regrettably, this logic loses sight of the forest for the trees. As the U.S. Supreme Court has explained in a related context, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Racial distinctions "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." Shaw v. Reno, 509 U.S. 630, 643, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).
 If a program that grants a preference to members of one race is problematic, the School District's use of the racial tiebreaker, which grants preferences to both whites (because they are white) and non-whites (because they are not white) at different times, is doubly so; the two wrongs do not, as the district court reasoned, make a right. Cf. Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 289-90, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (plurality opinion) ("The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.").
 
 
 [11]
 Regrettably, the district court did not recognize that it could (and indeed, under the statute, it should) have avoided the difficulties of construing the statute to meet what it thought the Washington and U.S. Constitutions required. Indeed, under the terms of the statute itself, the court ought to have construed thestatute first. Only then should it have determined whether the statute conflicted with these higher laws and, if so, enforced it only to the extent permitted by those laws. See Wash. Rev.Code § 49.60.400(9) ("If any part or parts of this section are found to be in conflict with federal law, the United States Constitution, or the Washington state Constitution, the section shall be implemented to the maximum extent that federal law, the United States Constitution, and the Washington state Constitution permit."). The district court's analysis did not take into account this subsection.
 
 
 [12]
 It appears that any difference between "remedyingde facto segregation" and "achieving racial diversity" is, at least for purposes of our analysis, one of semantics. Racially concentrated housing patterns would no doubt lead to racially concentrated schools if school assignment were based only on the proximity of a student's residence to a given high school; that is to say, in the absence of a "remedy" for de facto segregation, schools would become "racially imbalanced." See also Brewer v. West Irondequoit Cent. Sch. Dist., 212 F.3d 738, 756 (2d Cir.2000) (Miner, J., dissenting) (concluding that "whether the interest is in developing a more lasting integration in the face of de facto segregation, in promoting racial diversity, or in reducing racial isolation, ... all are similar").
 
 
 [13]
 The other Washington case cited by the district court,Dawson v. Troxel, 17 Wash.App. 129, 561 P.2d 694 (1977), is not to the contrary. The district court cited this decision — twice — for the proposition that "`in some circumstances a racial criterion [m]ay be used — and indeed in some circumstances [m]ust be used — by public educational institutions in bringing about racial balance.'" Id. at 696 (quoting DeFunis v. Odegaard, 82 Wash.2d 11, 507 P.2d 1169, 1179 (1973)).
 The meaning of this quotation is opaque. First, the quote is taken out of context; the very next sentence of DeFunis explains the quote: "School systems which were formerly segregated de jure now have an affirmative duty to remedy racial imbalance." DeFunis, 507 P.2d at 1179 (footnote omitted). Nothing in Dawson (or DeFunis) indicates that schools have a duty to remedy racial imbalance in the absence of prior de jure segregation.
 Moreover, Dawson was not discussing whether the Washington Constitution requires racially balanced educational institutions. Instead, the quote comes from a part of the opinion in which the Court rejected the plaintiffs' challenge to a race-based transfer system under the Equal Protection Clause of the United States Constitution. Properly understood, then, the quote just explains that under the federal Equal Protection Clause, sometimes schools may (as the Washington Supreme Court cases discussed above confirm), and sometimes they must (e.g., in cases of prior de jure segregation), use a racial criterion to achieve racial balancing.
 Finally, even if Dawson held that the Washington Constitution requires racially balanced schools — which it assuredly does not — this court would not have to follow it; it is inconsistent with the Washington Supreme Court cases discussed above and thus, because it is an intermediate appellate court decision, it is not controlling.
 
 
 [14]
 Certainly federal law does not control this state law question, and the district court did not conclude otherwise. But as the district court recognized, in this highly contentious area, where federal and state laws overlap, federal cases discussing racial preferences and discrimination certainly provide persuasive authority for the proper construction of section 49.60.400See Parents Involved, 137 F.Supp.2d at 1229. Indeed, the Washington Supreme Court has recognized that "Washington courts have looked to the interpretation of the federal law in construing [Washington Revised Code chapter] 49.60." Farnam v. CRISTA Ministries, 116 Wash.2d 659, 807 P.2d 830, 838 (1991) (collecting cases).
 
 
 [15]
 Prop. 209 provided, in relevant part, that "[t]he state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."Coalition, 122 F.3d at 696.
 
 
 [16]
 The concurrence chides us that federal law, andBakke specifically, is irrelevant to our analysis because "the Washington Supreme Court's reliance on federal cases to construe state statutes is limited to situations in which the statutory text of the two parallel provisions is identical or substantially similar." Concurrence at 5695. Respectfully, we agree with the theory, but not with the application; we think the concurrence construes Washington precedent too narrowly.
 In our view, section 49.60.400(1) is, in fact, "substantially similar" to the statute analyzed in Bakke. We must remember that although Bakke dealt with the Equal Protection Clause, it did so only after concluding that the Clause and 42 U.S.C. § 2000d were coterminous. Bakke, 438 U.S. at 287, 98 S.Ct. 2733. And that statute is remarkably similar to section 49.60.400(1). Compare 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, ... be subjected to discrimination under any program or activity receiving Federal financial assistance."), and Bakke, 438 U.S. at 307, 98 S.Ct. 2733 ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake.") (emphasis added), with Wash. Rev.Code § 49.60.400(1) ("The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, ... color, ... or national origin in the operation of [various state activities].").
 As the phrase "substantially similar" tends to indicate, the Washington courts have found federal cases helpful in interpreting state law where the federal and state provisions are not exactly the same. See, e.g., Farnam, 807 P.2d at 838-39 (using federal cases to inform the analysis of a provision that exempted employees of "religious organizations" from state discrimination law, even though the wording of the state and federal provisions differed significantly, and even though the state exemption did not — as the federal exemption did — apply only to employees' actions "connected with the carrying on by such corporation, association, educational institution, or society of its activities"). Further, the state and federal statutes in this case are directed to the same end: preventing the government (or those receiving funds from the government) from making distinctions based on race. See, e.g., Roberts v. Atl. Richfield Co., 88 Wash.2d 887, 568 P.2d 764, 767-68 (1977) (concluding that cases interpreting a series of different federal statutes could inform the analysis of a single Washington statute not because the language of the statutes was the same, but because "[f]ederal statutes, ... like our own[,] seek to eliminate such discrimination"). Thus, we believe Justice Powell's discussion in Bakke of discrimination and preferences under 42 U.S.C. § 2000d to be highly relevant to the meaning of "preference" for purposes of Wash. Rev.Code § 49.60.400(1) — especially given this Court's recent pledge of continued allegiance to that opinion. See Smith, 233 F.3d at 1201.
 
 
 [17]
 Of course, the School District's use of the racial tiebreaker differs in operation from the program at issue inBakke. Under the racial tiebreaker, "minority" students are admitted preferentially until some pre-determined ratio is met — that is, "majority" students are effectively barred until the ratio is attained, after which time "majority" students and "minority" students are admitted with equal preference based on distance. Under the Bakke program, in contrast, the reserved seats are blocked out a priori. This is, however, a distinction without a difference. Whether "majority" students are foreclosed from slots at the end because there is no more room, or at the beginning of the process, they are in either case excluded.
 
 
 
 61
 GRABER, Circuit Judge, specially concurring.
 
 
 62
 I concur specially because the racial tiebreaker that Seattle School District No. 1 uses to assign some public high school students to desirable schools plainly "grant[s] preferential treatment" to those students on the basis of their race, in violation of Initiative 200, which is codified as Washington Revised Code § 49.60.400 ("I-200").[1] Nothing in the United States Constitution or the Washington Constitution forbids the citizens of Washington from enacting a law like I-200 or requires that the law be interpreted to allow a racial tiebreaker in the circumstances presented here. I am aware of no relevant case constitutionally requiring a racial tie-breaker in the absence of de jure school segregation and in the absence of any affirmative act on the part of a school district to create school segregation.[2] To the extent that racial segregation exists in Seattle's high schools, as the majority explains, it results from general residential patterns only.
 
 
 63
 I write separately because, in my view, the majority errs in two fundamental ways when it discusses federal law as an aid to interpreting I-200. First, in these circumstances the Washington Supreme Court would not turn to federal law for interpretive guidance; this fact makes the discussion of federal law surplusage. Second, the majority reads federal precedent too narrowly.
 
 
 64
 A. The Washington Supreme Court Would Not Use Federal Precedent Here.
 
 
 65
 Our task is to interpret I-200 as we believe the Washington Supreme Court would. NLRB v. Calkins, 187 F.3d 1080, 1089 (9th Cir.1999). In construing a state statute, that court generally limits its reliance on federal law to those instances in which the two statutes are worded in essentially the same way. The portion of I-200 that is significant here has no analogue in federal law, so there is no federal case construing a substantially similar provision.
 
 
 66
 The genesis of this limiting principle appears to be Black Ball Freight Service, Inc. v. Washington Utilities & Transportation Commission, 74 Wash.2d 871, 447 P.2d 597 (1968), which concerned the regulation of motor carriers. The Washington Supreme Court noted there that "[t]he statute, as amended, is substantially the same as the federal statute appertaining to the issuing of permits by the Interstate Commerce Commission ... to interstate motor carrier applicants. 49 U.S.C.A., § 307 (1963)." Id. at 599 (emphasis added). The court then turned to federal cases decided under the parallel provision to the extent that it considered them to be "cogent." Id. To the same effect, see Drinkwitz v. Alliant Techsystems, Inc., 140 Wash.2d 291, 996 P.2d 582, 589 (2000); Inland Empire Distribution Sys., Inc. v. Utils. & Transp. Comm'n, 112 Wash.2d 278, 770 P.2d 624, 627 (1989).
 
 
 67
 The Washington Supreme Court expressed this limitation again in Bravo v. Dolsen Cos., 125 Wash.2d 745, 888 P.2d 147 (1995), a case involving the meaning of employees' "concerted activity" in a labor law context. The supreme court noted: "Although federal authority is not controlling in interpreting state statutes, it can be persuasive where the texts of both federal and state laws are similar." Id. at 153; see also Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 9 P.3d 787, 799 (2000) (stating that, because "the language of the [National Labor Relations Act] is very similar to the [state statutory] language here," the court "considers persuasive the federal cases interpreting" the NLRA).
 
 
 68
 This requirement of substantially similar text has carried over to the anti-discrimination context as well. In Roberts v. Atlantic Richfield Co., 88 Wash.2d 887, 568 P.2d 764, 767-68 (1977), the court noted the similarity of the federal and state statutory provisions before turning for guidance to federal cases. More recently and more explicitly, the Washington Supreme Court applied the requirement of textual similarity in Farnam v. CRISTA Ministries, 116 Wash.2d 659, 807 P.2d 830 (1991). There, the court held that, "because RCW 49.60 substantially parallels the federal law against discrimination, Title 7 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., Washington courts have looked to the interpretation of the federal law in construing RCW 49.60." Id. at 838 (footnote omitted). Before turning to the federal cases, the court quoted the "parallel" federal statutory text. Id. at 838 n. 6; see also Ellis v. City of Seattle, 142 Wash.2d 450, 13 P.3d 1065, 1071 (2001) (stating that the Washington whistleblower statute "has an analog in federal antidiscrimination law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)," before citing a federal case interpreting that analogous federal statute).
 
 
 69
 Perhaps the most important case for present purposes is Marquis v. City of Spokane, 130 Wash.2d 97, 922 P.2d 43 (1996). In that case the question was whether the anti-discrimination provisions of section 49.60 apply to independent contractors. The court began by acknowledging that, "[i]n construing the law against discrimination, we have sometimes looked for guidance to cases interpreting equivalent federal law. Xieng v. Peoples Nat'l Bank, 120 Wash.2d 512, 518, 844 P.2d 389 (1993)." Marquis, 922 P.2d at 50. Nonetheless the Washington Supreme Court went on to reject the argument of the City of Spokane that urged the court "to adopt the reasoning of federal cases interpreting Title VII of the federal civil rights act." Id. The court rejected reliance on federal cases because "[t]he language of our statute's definition section [defining "employee"] differs from that of Title VII." Id. Additionally, the state statute contained a provision that the federal statute did not:
 
 
 70
 While Title VII of the Civil Rights Act of 1964 is similar to RCW 49.60.180, the provision delineating unfair practices in employment, there is no provision in the federal law which sets forth the equivalent of the broad language of RCW 49.60.030(1) and there is no statutory provision requiring liberal construction in order to accomplish the purposes of the act. Federal cases interpreting Title VII are thus not helpful in determining the scope of RCW 49.60.030(1).
 
 
 71
 Id. (citation omitted). Thus, the rule in Washington is that the interpretation of federal anti-discrimination laws is not persuasive when the state provision "is significantly different from corresponding federal law." Brown v. Scott Paper Worldwide Co., 143 Wash.2d 349, 20 P.3d 921, 926 (2001).
 
 
 72
 To summarize, the Washington Supreme Court's reliance on federal cases to construe state statutes is limited to situations in which the statutory text of the two parallel provisions is identical or substantially similar. That situation does not exist here with respect to the key portion of I-200.
 
 
 73
 Moreover, to the extent that the foregoing cases rely on a presumption that the Washington legislature consciously intends parallelism when it enacts a statute modeled on federal law, that presumption does not apply to initiatives. Instead, the interpretation of a voter initiative starts with a different premise: its text means what an average informed lay voter would think it means. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 11 P.3d 762, 780 (2001); Senate Republican Campaign Comm. v. Pub. Disclosure Comm'n, 133 Wash.2d 229, 943 P.2d 1358, 1365 (1997). An average informed lay voter would not look to the intricacies of federal law when evaluating the meaning of the phrase "grant preferential treatment."
 
 
 74
 B. The Majority's Reliance on Bakke is Misplaced.
 
 
 75
 The majority suggests that Regents of University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), "lends support to the notion that the racial tiebreaker constitutes a preference, and consequentially, that it violates Washington law[I-200]." (Maj. op. at 1252.) Even assuming that federal cases such as Bakke bear on the meaning of I-200, the majority's analysis of Bakke is incomplete in three ways.
 
 
 76
 First, although the majority quotes extensively from Justice Powell's opinion, it takes his statements out of context. Justice Powell did not conclude that the University of California's admissions policy violated federal law simply because it granted a "preference" to minority students. Instead, he found the university's use of racial classifications impermissible only after engaging in a fact-driven analysis of the nature of the racial preference and the purposes served by it. Bakke, 438 U.S. at 299, 305, 98 S.Ct. 2733; see also Smith v. Univ. of Wash. Law Sch., 233 F.3d 1188, 1197 (9th Cir.2000), cert. denied, 532 U.S. 1051, 121 S.Ct. 2192, 149 L.Ed.2d 1024 (2001). Justice Powell's statements have meaning, therefore, only in the context of a certain type of racial preference and a certain rationale offered to justify it.
 
 
 77
 By contrast, our analysis of the school district's assignment plan begins and ends with our assessment that it "grant[s] preferential treatment to" certain students "on the basis of race" within the plain meaning of I-200. Wash. Rev.Code § 49.60.400. Because both the specific nature of the racial preference and the purposes served by it are irrelevant to the question whether the preference violates the plain text of Washington law, nothing in Justice Powell's opinion can aid us in evaluating the meaning of the term "preferential treatment" in I-200.
 
 
 78
 Second, to the extent that the majority intends to suggest that federal law disallows all uses of racial classifications in educational admissions decisions, it is inconsistent with Bakke and with Ninth Circuit precedent. Justice Powell's opinion in Bakke did not hold that all racial preferences designed to further any purpose are impermissible but, instead, held only that some types of racial preferences are unlawful when employed to further some purposes. Bakke, 438 U.S. at 305-20, 98 S.Ct. 2733. Thus, although Justice Powell concluded that the University of California's admissions policy violated federal law, he noted explicitly that other race-conscious policies still would be permissible. Id. at 311-12, 98 S.Ct. 2733 ("[A]ttainment of a diverse student body ... clearly is a constitutionally permissible goal for an institution of higher education."); id. at 317, 98 S.Ct. 2733 (noting that "race or ethnic background may be deemed a `plus' in a particular applicant's file [when] it does not insulate the individual from comparison with all other candidates for the available seats"); id. at 320, 98 S.Ct. 2733 ("[T]he State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin.").
 
 
 79
 Similarly, this court has held that race may be considered in the context of educational admissions decisions. For example, in Smith we held that "the Fourteenth Amendment permits University admissions programs which consider race for other than remedial purposes, and educational diversity is a compelling governmental interest that meets the demands of strict scrutiny of race-conscious measures." Smith, 233 F.3d at 1201. In arriving at that holding, we interpreted Bakke to permit the use of some racial classifications in the context of admissions decisions:
 
 
 80
 The district court denied Smith's partial summary judgment motion because it decided that under Supreme Court precedent race could be used as a factor in educational admissions decisions, even where that was not done for remedial purposes....
 
 
 81
 There can be no doubt that the district court's decision faithfully followed Justice Powell's opinion in [Bakke].
 
 
 82
 Id. at 1196.[3] Likewise, in Hunter ex rel. Brandt v. Regents of University of California, 190 F.3d 1061, 1063 (9th Cir.1999), we held that achieving diversity and remedying past discrimination are not the only compelling interests that can justify racial classifications under federal law: "California had a compelling state interest in operating a research-oriented elementary school dedicated to improving the quality of education in urban public schools...."
 
 
 83
 Third, to the extent that the majority suggests that the school district's assignment plan is impermissible simply because it shares some features in common with the university's admissions policy in Bakke, it oversimplifies Justice Powell's analysis. The form of a racial classification alone does not make it impermissible under federal law. To the contrary, Bakke requires a weighing of both the form of the classification and the purposes served by it. Accordingly, any type of racial classification, including the one employed by the school district here, may be consistent with federal law so long as it is the most narrowly tailored means to serve a particular compelling government interest, an issue that we need not and do not decide here.
 
 
 84
 The majority's desire to respond to the district court's reliance on federal law to interpret I-200 is understandable. In my view, however, the district court's error was in using federal cases to interpret a state statute in the first place, when the key portion of that statute has no federal counterpart. We need not consider whether the district court read those cases correctly.
 
 
 85
 For the foregoing reasons, I concur in the result.
 
 ORDER GRANTING INJUNCTION
 
 86
 Appellant's motion for an injunction pending the filing and disposition of any petition for rehearing or rehearing en banc is GRANTED. The Appellees are hereby enjoined from using the racial tiebreaker in making high school assignments pending further order of this court.
 
 
 87
 The motion for immediate issuance of the mandate is DENIED.
 
 
 
 Notes:
 
 
 [1]
 I-200 provides, in relevant part: "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." Wash. Rev.Code § 49.60.400(1) (emphasis added).
 
 
 [2]
 We are not called on to decide the different question whether the federal constitution forbids a school district from using a racial tiebreaker in these circumstances. We need not answer that question because, as a matter of state law, the racial tiebreaker is impermissibleSee Clark v. City of Lakewood, 259 F.3d 996, 1016 n. 12 (9th Cir.2001) ("[W]e look first to state law to resolve this issue, in accordance with our longstanding principle that courts should avoid making federal constitutional decisions unless and until necessary.").
 
 
 [3]
 Our opinion inSmith also suggests that I-200 is to be interpreted separately from federal law. We held that "a properly designed and operated race-conscious admissions program" at a public university would not violate federal statutory or constitutional law as interpreted in Bakke. Smith, 233 F.3d at 1201. However, we also held that compliance with federal law was no help to the university, because "it is bound by I-200, which precludes it from granting `preferential treatment' to any individual `on the basis of race.'" Id. In other words, we recognized that the meaning of I-200 does not depend on federal law but, instead, places different and greater limits on the state's ability to consider race in making school admissions decisions.